**PENALOSA COOPERATIVE EXCHANGE, Plaintiff,**

v.

**A.S. POLONYI COMPANY, Defendant.**

**No. 88–0006–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

Jan. 2, 1991.

Bruce B. Waugh, Gilliland & Hayes, P.A., Kansas City, Mo., Gerald L. Green, Gilliland, Hayes, Schmidt, Dillon & Green, P.A., Hutchinson, Kan., for Penalosa Co-op.

James F. Duncan, Brian D. Williams, Watson, Ess, Marshall & Enggas, Kansas City, Mo., Douglas C. McKenna, Watson, Ess, Marshall & Enggas, Olathe, Kan., for A.S. Polonyi Co.

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARTLETT, District Judge.

Plaintiff Penalosa Cooperative Exchange (Co-op) alleges that from September 1983, through December 1985, Wayne Winter (Winter), its general manager, embezzled funds from plaintiff and used the money to speculate in the commodities market for his own account. During that time, Winter employed A.S. Polonyi Company (Polonyi) as his commodities broker. According to plaintiff, Winter's trades from 1983 through 1985 involved approximately $1,276,500 of plaintiff's money and ultimately resulted in losses to plaintiff of $810,500.

Plaintiff has filed a Motion for Partial Summary Judgment seeking the determination that defendant is not a holder in due course and thus is not insulated from liability under § 400.3–305 of the Uniform Commercial Code.

Polonyi has filed a Motion for Summary Judgment arguing that plaintiff's tort claims are barred by the statute of limitations. For the reasons stated in the Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, plaintiff's remaining common law tort claims are for conversion and money had and received.

Defendant also argues that all of plaintiff's claims are barred under various sections of the UCC.

### I. Facts

Penalosa is and was at all relevant times a Kansas cooperative with its principal place of business in Penalosa, Kansas. Polonyi is a Missouri corporation with its offices in Missouri. Polonyi is a member of the Kansas City Board of Trade and the Minneapolis Grain Exchange. Primarily, Polonyi trades commodity futures for cus-

tomer accounts. Polonyi charges its customers a fee for services.

In September 1982, the Co-op's Board of Directors (Board) passed a resolution authorizing Winter "to hedge corn futures, for grain sorghum, and soybean futures with a ten contract limit on corn, and a four contract limit on soybeans." This authorization was an extension of an earlier resolution passed by the Board in the spring of 1982 whereby Winter had been restricted to trading only in wheat futures. However, Winter was not authorized to speculate for the Co-op. The Board resolutions, passed in the spring of 1982 and in September 1982, restricted Winter to conducting transactions through the Farmers Commodities Corporation (FCC). The FCC furnished the Board president with monthly statements summarizing the trades.

On September 19, 1983, Winter opened a personal trading account with Polonyi by filling out a form entitled "New Accounts—Business and Other Organizations" and by signing a "General Customers Agreement" and "Customers Margin Agreement" on the second page of the new accounts form. Exhibit C attached to plaintiff's Motion for Partial Summary Judgment. Polonyi concedes that the new accounts form was filled out by Winter. On the form, Winter stated that the type of organization for which the account was established was a sole proprietorship. The name of the organization was "Wayne L. Winter." The mailing address for the organization was "Penalosa Co-op Exchg, Penalosa, Ks." Winter stated on the form that he was the proprietor of the sole proprietorship and that the account was to be "speculative." Winter provided "Durham State Bank" as the banking connection. Winter was the only individual authorized to transmit orders and instructions relating to this account.

Polonyi considered Winter its customer. Polonyi did not consider the Co-op to be its customer and did not have an account for the Co-op.

Winter opened his account with Polonyi with a check signed by him in the amount of $5,000 dated September 27, 1983, payable to "A.S. Polonyi Co." and drawn on the account of the Penalosa Cooperative Exchange at the State Bank of Kingman. From September 1983, through May 1984, Polonyi accepted nine checks from Winter in payment of trades placed by Winter:

| | |
|---|---|
| September 27, 1983 | $ 5,000 |
| October 14, 1983 | 10,000 |
| December 27, 1983 | 10,000 |
| January 16, 1984 | 8,000 |
| February 2, 1984 | 5,000 |
| February 13, 1984 | 3,500 |
| March 17, 1984 | 4,000 |
| May 16, 1984 | 8,000 |
| June 20, 1984 | 10,500 |
| | $64,000 |

The checks were all made payable to A.S. Polonyi Company and were drawn on the Co-op's account at the State Bank of Kingman.

From July 1984, through December 1985, Polonyi accepted 26 wire transfers authorized by Winter and deposited into Winter's account.

| | |
|---|---|
| July 19, 1984 | $ 6,500 |
| August 28, 1984 | 12,000 |
| October 12, 1984 | 8,000 |
| January 18, 1985 | 16,000 |
| February 6, 1985 | 21,000 |
| March 5, 1985 | 12,000 |
| March 11, 1985 | 10,000 |
| March 12, 1985 | 20,000 |
| March 15, 1985 | 22,000 |
| March 18, 1985 | 24,000 |
| March 19, 1985 | 30,000 |
| May 28, 1985 | 30,000 |
| May 31, 1985 | 15,000 |
| June 7, 1985 | 90,000 |
| June 14, 1985 | 10,000 |
| July 1, 1985 | 120,000 |
| July 5, 1985 | 150,000 |
| July 24, 1985 | 50,000 |
| August 7, 1985 | 60,000 |
| August 13, 1985 | 34,000 |
| August 15, 1985 | 150,000 |
| September 3, 1985 | 80,000 |
| September 18, 1985 | 35,000 |
| October 17, 1985 | 60,000 |
| December 17, 1985 | 100,000 |
| | $1,192,500 |

Each wire transfer was from the Co-op's account at the State Bank of Kingman.

Money from Winter's account with Polonyi was used to pay for trades ordered by Winter. Also, Winter directed Polonyi on a

number of occasions to wire transfer money from his account to the Co-op's account at the State Bank of Kingman:

| | |
|---|---|
| September 5, 1984 | $ 12,000 |
| November 23, 1984 | 8,000 |
| February 12, 1985 | 16,000 |
| March 28, 1985 | 21,000 |
| June 28, 1985 | 100,000 |
| July 21, 1985 | 190,000 |
| August 1, 1985 | 69,000 |
| | $466,000 |

Winter paid Polonyi commissions totaling $6,085.30 in 1983; $20,935.10 in 1984; and $340,252.70 in 1985. In 1985, 19.7 percent of Polonyi's total revenue was from Winter's business.

Polonyi employees Shearman, Richardson and Hanke were aware that Winter worked for the Co-op. Polonyi's floor manager, Judith Shearman, saw each check and wire transfer to Winter's account. However, none of Polonyi's employees had any contact with Winter other than to effectuate the commodity trades that he ordered.

Every check and wire transfer sent to Polonyi was paid; no check was returned for lack of funds or lack of authority on the signature.

During the time Winter was trading with Polonyi, Polonyi did not receive any communication from the Co-op suggesting that Winter was unauthorized to trade in the manner in which he was trading or that any check or wire transfer that he sent was unauthorized.

Article IV of the Co-op's bylaws in effect from 1982 through 1985, under subheading "Manager—*Powers and Duties,*" provides in pertinent part:

> Manager shall ... maintain his records and accounts in such a manner that the true and correct condition of the business may be ascertained therefrom at any time; furnish the Board a current statement of the business and affairs of the association at each monthly meeting of the Board, and at the end of each fiscal year, and at other such times, and in such form, as the Board may direct....

The Board required and received monthly financial information consisting of comparative operating statements and statements of gross margins.

During a period of time in 1982 and 1983, after the Co-op had borrowed money from the Wichita Bank for Cooperatives (WBC) to build an elevator and an office building, WBC required that the Co-op furnish quarterly balance sheets. During this time, Winter prepared the balance sheets and submitted them to the Board. These balance sheets "weren't produced monthly." Woodson deposition at 49, 51. The last balance sheet submitted to the Board was in September 1983. From September 1983, through December 1985, the Board received neither monthly nor quarterly balance sheets from Winter.

In his affidavit, Conrad Woodson, President of Co-op's Board, described the financial information furnished to the Board:

> The Co-op board has never received monthly balance sheets. It has always received monthly financial statements consisting of a statement of gross margins and a comparative operating statement. The board also obtained annual year-end audits by independent CPA firms, copies of which are attached for the years ending 1983 and 1984.....
>
> At its monthly board meetings, the board would go over the financial statements, ask questions of Mr. Winter concerning the statements, assets and liabilities of the Co-op, and satisfy itself as to the financial condition of the Co-op. Specifically, the board would inquire as to the amount of the operating lines of credit. In 1985, Winter misrepresented to the board the amounts of those loans.
>
> At no time did Robert Hinckley ever advise the Co-op board that its accounting procedures or controls were deficient, inadequate or needed changing.
>
> The Co-op board and employees, other than Wayne Winter, first learned of his embezzlement on January 7, 1986. I received a call from the auditors that morning and was informed that Winter had confessed the night before.

Woodson affidavit at ¶¶ 1–5 (Exhibit 7, Plaintiff's Response to Defendant's Motion for Summary Judgment).

Winter financed his commodity trading by drawing upon the Co-op's line of credit with WBC. At Winter's direction, WBC transferred money to the Kingman Bank. Money in the Co-op's Kingman Bank account was then transferred to Polonyi by wire transfer ordered by Winter or by check written by Winter. From 1983 through 1985, the Board was aware that Winter had authority to draw on the line of credit extended by WBC. WBC provided to Winter, as general manager of the Co-op, a quarterly report of the Co-op's outstanding loan balance, a statement of interest due and a statement of the override due. Woodson did not know that WBC routinely generated statements showing the Co-op's total outstanding indebtedness to WBC. Between 1983 and 1985, Woodson did not see any monthly or quarterly reports showing the status of the Co-op's line of credit with WBC. With the exception of the audit reports received once a year, the only information the Board received concerning the amount of the WBC loan was what Winter disclosed. Woodson deposition at 194 (Exhibit 83 to Polonyi's Motion for Summary Judgment).

On both a weekly and monthly basis a detailed listing of accounts receivable was printed out. Also, a listing of delinquent accounts receivable was obtained from the computer on a regular basis. Winter regularly received copies of these accounts receivable reports. The Board did not as a general matter review the detailed accounts receivable reports except to examine reports of accounts that had been delinquent in excess of 30, 60 or 90 days.

As of December 31, 1984, Winter's personal accounts receivable with the Co-op had a balance of $45,336.33. During the end of 1983, and during 1984, Winter charged portions of his commodities trading losses against this account, including a $38,600 charge in December 1984. Throughout most of 1985, the balance in this account remained above $40,000, a substantial part of which was delinquent. The following chart shows the monthly balance of Winter's Co-op account during 1985 and the amount that was delinquent:

|  | Winter's Account Receivable Balance | Winter's Total Delinquent Balance |
| --- | --- | --- |
| February 25, 1985 | $39,272.15 | $38,560.78 |
| March 25, 1985 | 40,473.53 | 38,560.78 |
| April 25, 1985 | 41,759.88 | 38,560.78 |
| May 25, 1985 | 42,840.86 | 39,272.15 |
| June 25, 1985 | 43,834.75 | 38,560.78 |
| July 31, 1985 | 44,492.27 | 39,232.79 |
| August 31, 1985 | 45,233.36 | 40,047.53 |
| September 30, 1985 | 46,141.38 | 41,758.88 |
| October 29, 1985 | 46,141.38 | 42,840.86 |
| December 30, 1985 | 26,221.00 | 22,838.25 |

Woodson deposition at 98–99, 242–45 (Exhibit 41 to defendant's Motion for Summary Judgment).

Winter's delinquent account would have shown up on the computer printout of delinquencies. Winter provided a handwritten summary of delinquent accounts receivable to the Board which did not include his own account. Woodson stated that he did not compare the Co-op's computerized list to Winter's handwritten summaries of delinquent accounts receivable. Woodson deposition at 85–86 (Exhibit 38 to defendant's Motion for Summary Judgment).

Robert E. Lee,[1] Director of Services for the Kansas Farmers Service Association,

1. Lee has been designated by plaintiff as an expert witness. Plaintiff objects to using Lee's testimony on any issue except the issue of damages. Plaintiff claims that he was designated as an expert only on damages. No such limitation is apparent in plaintiff's answer to defendant's

testified that the Board should have required monthly balance sheets and comprehensive listings of accounts receivable. Lee stated: "I think they [the Board] had a fiduciary responsibility to inquire about a balance sheet." Lee deposition at 157 (defendant's Exhibit 22). Lee further stated: "I think a balance sheet is a most essential part of the total financial statement." *Id.*

Q. Do you have any knowledge that the Coop was supplying monthly balance sheets to the board of directors at any time from '83 through '85?

A. I'm sure they were.

Q. Is the reason you're sure they were because that's the custom and practice by which coops operate in the State of Kansas?

A. Yes.

Q. And based upon your experience and your training, do you normally observe that coops provide their board of directors with monthly balance sheets?

A. Yes, particularly if the bank is involved.

Q. And that's generally recognized practice, according to your experience, correct?

A. Yes.

Lee deposition at 76 (Exhibit 23).

When asked if he believed the Board was derelict in its duties in making no demand for a monthly balance sheet, Lee stated: "I'd have to say that I think that they were not living up to their fiduciary responsibilities of maintaining control or knowledge of the financial condition of the organization." *Id.* at 153 (defendant's Exhibit 24).

Q. Let me rephrase the question. I want you to assume that after September 1983 they were furnished with the income statement and they were furnished with the statement of gross margins, but not with the balance sheet, that up to that time they had gotten all three parts, but as of and after September 1983 they were no longer furnished with the balance sheet.

A. I think they would have had an obligation to demand they had a balance sheet.

Q. And likewise, do you believe, for the reasons you earlier testified, that they were derelict in their duties in not obtaining and demanding a monthly balance sheet?

.      .      .      .      .

A. I think that I'd have to say that with the past history that these directors have had with the manager, the good relationship that they've had within the manager, that they may not be uncomfortable with not getting the balance sheet. Again, let me bear in mind or remind you that our directors are not independent directors. Every decision that they make on that board affects them in some fashion. It affects their—if they tamper with gross margins, they are directly affected. If they tamper with allocation, they are directly affected. So their decisions are not independent, as we know them outside. As the directors turn over, they follow the pattern as to what has been presented to them before. Obviously, in my estimation as an accountant, they should have demanded and received a balance sheet.

Q. A monthly balance sheet?

A. Yes, sir. But I can understand, also, their position that if they came on the board and they were receiving this, most of them are not acquainted with corporate finance and they may have relied strictly upon this and would have had reason to believe that they were getting what they were supposed to get.

Lee deposition at 155–56 (Exhibit 12 to plaintiff's Opposition).

Q. Factors that enter into the kind of information that the board of directors of coops see, would the fact that even if you assumed they were not receiving monthly balance statements, would you take into consideration the fact that they were

Interrogatory 20. Plaintiff identified each person it expected to call as an expert witness and the subject matter about which each expert would testify. As to Lee, plaintiff stated: "Bob

Lee. See deposition testimony of Bob Lee." Exhibit 1 to defendant's Motion for Summary Judgment.

receiving year-end, audited statements by CPA's?

A. Right.

Q. Would that fact, in your opinion, tend to lessen the duty of the board to expect monthly statements from their general manager?

.      .      .      .      .

A. Obviously the board of directors are probably going to place more reliance upon the audit report than they are on their own financial statement. As a trade industry, there are still many organizations out here that—I say many, there isn't that many, there are a few organizations who are very well financed and get along very well that don't receive monthly financial statements. Some of them will receive quarterly financial statements and some of them receive—have an audit report, audit twice a year, they'll have an interim audit to do that. So it isn't an uncommon thing; however, it's not what we as accountants recommend.

Lee deposition at 249–50 (*id.*).

Lee was also asked about whether it was common practice for WBC to send information on the status of a Co-op's loan directly to the Board.

Q. Based upon your experience, was it that type of information that the Wichita Bank for Cooperatives would distribute on a quarterly basis to various Kansas coops?

A. Yes, sir.

Q. Did that information go to the Board?

A. I can't really answer that. I'm of the opinion not.

Q. Do you know whether or not the Wichita Bank for Cooperatives has any policy with regard to routing that type of information to the board?

A. I cannot say. I don't recall that they did back when I was auditing.

Lee deposition at 98 (*id.*).

Lee also testified that the Board's failure to review a report of all accounts receiva-

in Co-ops across the country. "Patrons did not want the board of directors looking at their account if it was current and seeing how much they might owe." Lee deposition at 175 (Exhibit 14 to plaintiff's Response to Defendant's Motion for Summary Judgment).

When asked, "Do you believe that the Coop, the board of directors of the Coop, should have exercised more control over the situation," Lee responded:

I think this happened so rapidly, even though we are talking about a period of years, we are talking about immaterial amounts early, this got real big, real quick, and I don't know as there was anything that they could have done about that unless the bookkeeper would have gone to them and said I think there's something wrong. I think that's the only way that this could have been encountered.

Lee deposition at 152 (Exhibit 12 to plaintiff's Response to Defendant's Motion for Summary Judgment).

Janet Hartley, Penalosa's bookkeeper, understood her responsibilities at the Co-op to be "account sales, ticket entry and filing and bank statements, waiting on customers . . . ." Hartley deposition at 9 (Exhibit 15 to plaintiff's Response to Defendant's Motion for Summary Judgment). Hartley also answered the telephone. Hartley understood sales tickets to mean counter tickets. Counter tickets were made to reflect sales and also purchase of supplies and inventory. Although Hartley would prepare counter tickets on general merchandise purchased by customers, Winter was responsible for preparing counter tickets for Co-op purchases or expenditures. Hartley was responsible for entering these counter tickets in the general ledger.

During the latter part of 1984 and throughout most of 1985, Hartley encountered discrepancies between the amount stated in the bank statement and the cash balance in the general ledger. Hartley testified that she sought Winter's assistance to reconcile the bank statement with the

(plaintiff's Exhibit 15). In order to reconcile the two accounts in 1984 and 1985, Hartley made a handwritten adjustment at the end of each month in the general ledger. Winter told Hartley what adjustment to make. "He would either, you know, tell me what account to put it into or he would make it himself or he would just have me make a ticket. So, I mean, I always went to him to ask what account to adjust it to because I didn't know." Hartley deposition at 17 (defendant's Exhibit 42).

The following chart shows the handwritten adjustments made by Hartley on the monthly bank reconciliation for the Co-op's bank account at the State Bank of Kingman.

| Deposition Exhibit | Date of Bank Reconciliation | Amount of Adjustment | Handwritten Comments on Bank Reconciliation |
|---|---|---|---|
| 32 | 8/3/84 | $ 12,000.00 | Wire transfer Polonyi. Didn't make ticket correcting this as draft going back run in Sept. |
| 33 | 10/31/84 | 8,000.00 | No ticket made will be put back in this month |
| 20 | 1/31/85 | 16,000.00 | Wire transfer for added back in Feb. deposit. No ticket made |
| 21 | 2/28/85 | 21,000.00 | Money wire–2/6/85; no ticket made |
| 22 | 3/31/85 | 34,815.48 | TKD 94005–Dat. Checks |
| | | 115,000.00 | See tikt 94029 4/11/85 |
| 24 | 5/31/85 | 15,006.00 | P–97004; 6/8/85 |
| | | 30,007.00 | P–07004; 6/4/84 |
| | | 30,006.00 | P–97004; 6/4/84 |
| 25 | 6/29/85 | 10,000.00 | Wire transfer; |
| | | 90,000.00 | Polonyi, no ticket made |
| 26 | 7/31/85 | 270,012.00 | Wire run thru backward Tkt. # 99998; |
| | | 50,000.00 | Wire transfer; no entry made |
| 27 | 8/31/85 | 60,000.00 | Wire transfer |
| | | 34,000.00 | from Polonyi |
| | | 150,000.00 | no tickets made |
| 28 | 9/30/85 | 60,000.00 | (Aug) |
| | | 34,000.00 | (Aug) |
| | | 150,000.00 | (Aug) |
| | | 100,000.00 | (Sept) |
| | | 35,000.00 | (Sept) |
| 29 | 10/31/85 | 60,000.00 | Money wire |

Defendant's Exhibit 45.

Despite having to adjust the cash balance of the general ledger to reconcile with the bank statements during much of 1985, Hartley stated that she "had no suspicion that Wayne would be doing anything that I would have to be concerned about." Hartley deposition at 85 (plaintiff's Exhibit 15).

Zella Jacobs, Hartley's assistant, was aware before the end of 1985 that substantial amounts of money were involved in the wire transfers from Polonyi. Jacobs knew that the bank reconciliations made by Hartley involved substantial amounts of money and that Winter had a substantial accounts receivable balance that was delinquent during some portion of 1985.

During 1985, Jacobs and Hartley discussed the problems in reconciling the bank account caused by the wire transfers. Polonyi came up during the discussions. Jacobs deposition at 39 (defendant's Exhibit 51).

Also, during 1985, Jacobs took several telephone calls from employees of Polonyi during which the caller would ask for Winter and Jacobs would either direct the call to Winter or state that she did not know where Winter was. The caller from Polonyi never told Jacobs the reason for the call. Jacobs knew that Polonyi was a commodity brokerage firm. *Id.* Jacobs realized that Polonyi was the company that had made several wire transfers to the Kingman Bank. Jacobs deposition at 45 (defendant's Exhibit 51).

Q. Ms. Jacobs, you understood that Mr. Winter was conducting commodities trading through the Polonyi company, correct?

A. Yes.

Q. And you understood that the Polonyi company with whom Mr. Winter was conducting commodity trading activities was the same Polonyi company that showed up on the bank reconciliations, correct?

A. Correct.

Q. And you had discussions with Janet [Hartley] about that fact, correct?

A. Correct.

Q. And you knew, therefore, that the adjusting items on the bank reconciliations had to do directly or indirectly with Mr. Winter's trading activities with Polonyi, correct?

A. Correct.

Jacobs deposition at 68–69 (plaintiff's Exhibit 23). Jacobs believed the calls from Polonyi concerned the Co-op's business, not Winter's personal business. Jacobs deposition at 106. Jacobs thought that Polonyi's calls had "just something to do with the grains, like the Farmers Commodity Corporation and that's all, ..." Jacobs deposition at 44 (plaintiff's Exhibit 23).

Despite the need for frequent bank reconciliations and the frequent telephone calls from Polonyi, Hartley and Jacobs did not realize at the time that there was any reason to be suspicious.

When Zella and after it all happened, we would stop and think about different things that were suspicious. This was after all, the bank statements and, you know, you just kind of start piecing things together. But up until that time [when Winter's embezzlement was discovered], it's just the thought of Wayne ever doing that never entered our minds.

Hartley deposition at 130 (plaintiff's Exhibit 24).

Jacobs testified that she did not suspect Winter was doing anything dishonest or stealing the Co-op's money. Jacobs deposition at 107 (plaintiff's Exhibit 16).

At some point in 1985, Woodson discovered that Winter had been trading commodity futures for the benefit of the customers of the Co-op. Woodson stated that "it didn't bother me that he was doing this. I took it as a service and I didn't see any particular harm in it." Woodson deposition at 160 (plaintiff's Exhibit 37). Woodson also testified that he recalled no other board member expressing any concern about Winter trading on behalf of customers. *Id.*

## II. *Standard for Summary Judgment*

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the Court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States*, 600 F.2d 725, 727–28 (8th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litiga-

tion and promotes judicial efficiency. *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). *See also City of Mt. Pleasant v. Associated Electric Cooperative, Inc.*, 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 106 S.Ct. at 2553.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the *absence* of genuine issues of material fact. However, the moving party *is not required* to support its motion with affidavits or other similar materials *negating* the opponent's claim. *Id.* (emphasis added).

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in his pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* 106 S.Ct. at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material

facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

The inquiry to be made mirrors the standard for a directed verdict: whether the evidence presented by the party with the onus of proof is sufficient that a jury could properly proceed to return a verdict for that party. *Id.* Essentially, the question in ruling on a motion for summary judgment and on a motion for directed verdict is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.*, 106 S.Ct. at 2512.

### III.  *Discussion*

#### A.  The Kansas Two Year Statute of Limitations Applies to Plaintiff's Claims

Defendant argues that by operation of Missouri's borrowing statute, Mo.Rev. Stat. § 516.190, the Kansas two-year statute of limitations applies to plaintiff's tort claims. Plaintiff argues that Missouri's five-year statute of limitations is applicable.

The parties agree that in determining the applicable statute of limitations, I must apply the law of Missouri.

In ruling on statutes of limitations issues, this court must apply the law of the forum. *Guaranty Trust Co. v. York*, 326 U.S. 99, 108–09, 65 S.Ct. 1464, 1469–1470, 89 L.Ed. 2079 (1945). Missouri, the forum, considers statutes of limitations issues procedural, and, therefore, governed by Missouri law. *Keaton v. Crayton*, 326 F.Supp. 1155, 1157–58 (W.D.Mo. 1969). Missouri allows five years to bring personal injury actions. Mo.Ann. Stat. § 516.120 (Vernon 1952). When a cause of action 'originates' in a state other than Missouri, however, Missouri applies the foreign state's statute of limitations through the borrowing statute. If that state's statute of limitations bars the action, the borrowing statute bars it

in Missouri as well. Mo.Ann.Stat. § 516.190....

*Renfroe v. Eli Lilly & Co.*, 686 F.2d 642, 646 (8th Cir.1982).

Missouri's borrowing statute, § 516.190, provides: "Whenever a cause of action has been fully barred by the laws of the state, territory or country in which it originated, said bar shall be a complete defense to any action thereon, brought in any of the courts of this state." "Originated" as used in § 516.190 is synonymous with "accrue" as used in § 516.100. *Dorris v. McClanahan*, 725 S.W.2d 870, 871 (Mo. banc 1987); *Renfroe*, 686 F.2d at 647.

Section 516.100 states: "For the purposes of § 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment...."

■ Section 516.100 not only determines when a cause of action accrues but also *where* it accrues for the purpose of applying the borrowing statute, § 516.190:

> The plaintiffs also argue that this court is free to disregard the general limitations provisions, § 516.100, in determining where a cause of action accrues because that section only prescribes when a cause of action accrues. We acknowledge that this section, by its terms, only specifies when a cause of action accrues. Following the Third Circuit, however, we refer to it also in determining where a cause of action accrues.
>
> We think the concept of when a cause arises and the concept of where a cause arises, both used to aid in the application of statutes of limitations, are *in pari materia*. In other words, the cause arises where as well as when the final significant event that is essential to a suable claim occurs. [*Mack Trucks, Inc. v. Bendix–Westinghouse Auto. Air Brake Co.*, 372 F.2d 18, 20 (3rd Cir.1966), *cert. denied*, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967).]
>
> As a result, we believe that the plaintiffs' causes of action originated where they sustained damage capable of ascer-

tainment. Although the Missouri courts have not directly addressed the issue of where a cause of action originates, they have applied this rule in many cases without comment....

*Dorris*, 725 S.W.2d at 870; *see also Renfroe*, 686 F.2d at 647 n. 9. Therefore, the applicable statute of limitations for this case will be furnished by the state where plaintiff sustained damage capable of ascertainment.

For the reasons stated by defendant, particularly in its Reply Brief (Doc. 61), plaintiff's damage was first capable of ascertainment in Kansas. Consequently, the Kansas statute of limitations will be borrowed and applied to plaintiff's tort claims. "[W]hen such statute is so borrowed, it is not wrenched bodily out of its own setting, but taken along with it are the court decisions of its own state which interpret and apply it, and the companion statutes which limit and restrict its operation." *Devine v. Rook*, 314 S.W.2d 932, 935 (Mo.App.1958).

B. Application of the Kansas Statute of Limitations to Plaintiff's Tort Claims

K.S.A. 60–513 provides:

(a) The following actions shall be brought within two years:

. . . . .

(2) an action for taking, detaining or injuring personal property, including actions for the specific recovery thereof.

. . . . .

(4) an action for injury to the rights of another, not arising on contract, and not herein enumerated.

. . . . .

(b) Except as provided in subsection (c), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitations shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than ten

years beyond the time of the act giving rise to the cause of action.

Polonyi argues that the Co-op's damage was reasonably ascertainable as early as 1983. Therefore, according to Polonyi, the tort claims alleged in the Complaint filed January 4, 1988, are barred by the statute of limitations.

The Co-op argues that 1) for statute of limitations purposes, suit was commenced against Polonyi on April 9, 1987, not January 4, 1988, and 2) that there is a genuine issue of material fact about when the fact of injury was reasonably ascertainable.

Plaintiff initially filed suit against Polonyi on April 9, 1987, in the District Court of Kingman County, Kansas. Polonyi removed the case to the United States District Court for the District of Kansas. The case was dismissed for lack of personal jurisdiction on October 16, 1987. Plaintiff filed suit here on January 4, 1988, within six months of its dismissal. Relying on the Kansas savings statute, K.S.A. 60–518, plaintiff argues that, for statute of limitations purposes, suit was commenced on April 9, 1987, when plaintiff first sued Polonyi in Kansas.

K.S.A. 60–518 provides:

If any action be commenced within due time, and the plaintiff fail in such action otherwise than upon the merits, and a time limit for the same shall have expired, the plaintiff, or, if the plaintiff die, and the cause of action survive, his or her representatives may commence a new action within six months after said failure.

K.S.A. 60–203 establishes when an action commences and provides:

(a) A civil action is commenced at the time of:

(1) filing a petition with the Clerk of the Court, if service of process is obtained or the first publication is made for service by publication within 90 days after the petition is filed, except that the court may extend that time an additional 30 days upon a showing of good cause by the plaintiff; or

(2) service of process or first publication, if service of process or first publication is not made within the time specified by provision (1).

(b) If service of process or first publication purports to have been made within the time specified by subsection (a)(1) but is later adjudicated to have been invalid due to any irregularity in form or procedure or any defect in making service, the action shall nevertheless be deemed to have commenced by the original filing of the petition if valid service is obtained or first publication is made within 90 days after that adjudication, except that the court may extend that time an additional 30 days upon a showing of good cause by the plaintiff.

(c) The filing of an entry of appearance shall have the same effect as service.

■ Defendant argues that the Kansas savings statute is inapplicable because it has no "extra-territorial [e]ffect and, therefore, does not apply to 'foreign' actions." In support of this position, defendant relies on *Jackson v. Prairie Oil & Gas*, 115 Kan. 386, 222 P. 1114 (1924), which held that a forum's savings statute does not apply when the earlier action is brought in some other state.

Here, plaintiff seeks to apply the Kansas savings statute to an action first brought in Kansas.

■ Next, defendant argues that because plaintiff never "commenced" an action in Kansas on April 9, 1987, K.S.A. 60–518 is not applicable. Defendant contends that under K.S.A. 60–203, an action is not commenced unless "service is obtained" within 90 days after the petition is filed. Because plaintiff's claims were dismissed for lack of personal jurisdiction, defendant states that *effective* service of process was never obtained. Defendant relies on *Cross v. General Motors Corp.*, 778 F.2d 468 (8th Cir.1985), as authority for the proposition that a statute of limitations will not be tolled by the filing of a case in a court where personal jurisdiction is lacking. *Cross* and the other cases relied on by defendant establish that an action will not be deemed to have been commenced if dismissed for lack of personal jurisdiction be-

cause of failure to properly serve the defendant. *See Newell v. Brollier,* 239 Kan. 587, 722 P.2d 528 (1986); *Vann v. Missouri, K & T Ry.,* 110 Kan. 799, 205 P. 607 (1922); *O'Neil v. Eppler,* 99 Kan. 493, 162 P. 311 (1917).

K.S.A. 60–203(a)(1) states that an action is "commenced" when "service of process is obtained." The plain meaning of that statement is that when service is made on a party, the action is commenced. There is no Kansas law suggesting that service of process was never "obtained" on a defendant if later the court determines it has no personal jurisdiction over the defendant. Moreover, in *Hughes v. Martin,* 240 Kan. 370, 729 P.2d 1200 (1986), the court, although interpreting K.S.A. 60–203(b), which is not applicable to this case, suggested that the commencement of an action is triggered when a defendant acquires actual knowledge of the pendency of the action. This position is further supported by *Prince v. Leesona Corp., Inc.,* 720 F.2d 1166 (10th Cir.1983). In *Prince,* plaintiff filed a negligence action in Missouri within the Kansas two-year statute of limitations. The case was dismissed for lack of personal jurisdiction after the two-year limitation period expired. Plaintiff then refiled the action in Kansas within six months. The issue in *Prince* was whether the Kansas savings statute applied to a suit originally brought in Missouri. In holding that the Kansas statute could apply, the court found it significant that defendant was put on notice of the action in a timely manner. *Id.* at 1169. Similarly, in this case, defendant was put on notice of plaintiff's claims in a timely manner by service of process in the Kansas case even though it was later dismissed for lack of personal jurisdiction.

In light of K.S.A. 60–102, which provides that the provisions of the Kansas Code of Civil Procedure are to be liberally construed, this action was "commenced" for purposes of the Kansas savings statute, § 60–518, on April 9, 1987, the date plaintiff filed its petition in the Kansas action.

The question remains whether the Kansas case was commenced "timely" on April 9, 1987. In determining whether the Kansas action was timely filed, the issue is whether the fact of injury was reasonably ascertainable prior to April 9, 1985.

■ "Fact of injury" refers to the time at which plaintiff has "actual or constructive knowledge" that plaintiff's damages have been caused by the act or omission of defendant. *Cowan ex rel. Cowan v. Lederle Laboratories,* 604 F.Supp. 438, 442 (D.Kan.1985). The statute of limitations begins to run when the facts and circumstances are such that a reasonable person would have learned of the damage. *Meyer v. Sinclair Prairie Oil,* 173 Kan. 246, 246 P.2d 245 (1952).

In *Noll v. Boyle,* 140 Kan. 252, 36 P.2d 330 (1934) (quoting 14a C.J. 100), the court stated:

'The directors of a corporation are chargeable with knowledge of ... such corporate affairs as it is their duty to keep informed of, of the financial condition of the corporation, and of facts which the corporate books and records disclose. But they are not chargeable with knowledge of all of the affairs of the corporation, and it is held that they are not chargeable with knowledge of its business transactions.'

In *Friends University v. W.R. Grace & Co.,* 227 Kan. 559, 608 P.2d 936, 941 (1980) (quoting with approval 51 Am.Jr.2d Limitation of Actions, § 148, 719–21), the court commented:

'There can be no concealment which will prevent the running of a statute of limitations where the cause of action is known to the plaintiff or there is a presumption of such knowledge. Where the defendant does not occupy a fiduciary or confidential relationship toward the plaintiff, neither affirmative nor passive conduct of the defendant will constitute such a concealment as to prevent the running of the statute of limitations, where through reasonable diligence on his part, he could have learned of the existence of his cause of action. It has accordingly been held that the party seeking to toll the statute of limitations must explain why due diligence did not

lead or could not have led to discovery of the acts and the cause of action.'

■ The law of agency generally imputes the knowledge of an agent to the principal. *City of Arkansas City v. Anderson*, 243 Kan. 627, 762 P.2d 183, 189 (1988).

■ Defendant argues that the Board had constructive knowledge of the Co-op's injury prior to April 9, 1985, based on the contents of the corporate books and records to which the Board had access and based on the knowledge of plaintiff's employees, Hartley and Jacobs. For instance, defendant relies on the fact that if plaintiff's Board had required Winter to furnish a monthly balance sheet after September 1983, it would have discovered Winter's embezzlement. Also, defendant asserts that had the Board requested the monthly loan balance statements from WBC, Winter's scheme would have been revealed.

Defendant relies on *Waite v. Adler*, 239 Kan. 1, 716 P.2d 524 (1986), and *Weigand v. Union National Bank of Wichita*, 227 Kan. 747, 610 P.2d 572 (1980), in support of its position that the Board did not exercise reasonable diligence and could have discovered its injuries prior to April 9, 1985. However, neither plaintiffs Waite nor Weigand were subjected to the same degree of misrepresentation as occurred in the instant case.

Plaintiff contends that the facts do not establish, as a matter of law, that plaintiff knew or should have known of the fact of injury before January 7, 1986. Plaintiff asserts that the Board acted with reasonable diligence because it held regular monthly meetings, reviewed certain financial documents, asked questions of Winter concerning the financial condition of plaintiff and conducted annual certified audits in 1983 and 1984 that did not reveal any misconduct on the part of Winter or any grave concern over the financial condition of plaintiff.

Both plaintiff and defendant rely on Lee's testimony to support their respective positions on whether the Board acted with reasonable diligence. Lee's testimony does not favor defendant's position exclusively.

Consequently, after reviewing all the facts presented, plaintiff has raised a genuine issue of material fact as to whether plaintiff exercised due diligence prior to January 7, 1986, and whether plaintiff knew or should have known of the fact of injury before April 9, 1985.

### C. Whether Plaintiff's Claims Are Barred Under UCC §§ 3–305, 3–403, 3–404 and 3–406

For the reasons stated in the Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Missouri substantive law applies. Therefore, Missouri's codification of the UCC applies. *See* V.A. M.S. §§ 400.3–305, 400.3–403, 400.3–404; 400.3–406.

### 1. *V.A.M.S. § 400.3–305 Rights of a Holder in Due Course*

The parties have filed Cross Motions for Summary Judgment on the issue of whether defendant is a holder in due course. Plaintiff argues that defendant is not a holder in due course while defendant argues that it is.

Section 400.3–302 defines a holder in due course as follows:

1) a holder in due course is a holder who takes the instrument

    (a) for value; and

    (b) in good faith; and

    (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

(2) a payee may be a holder in due course.

■ The Co-op argues that defendant is a "holder" of the checks and wire transfers under § 400.1–201(20). As such, the Co-op contends that defendant took the negotiable instruments subject to all valid claims of the Co-op. § 400.3–306(a). The Co-op contends that in order to avoid liability, Polonyi must establish that it is a holder in due course as defined in § 400.3–302 and that Polonyi, as a matter of law, cannot do so. The Co-op contends that defendant is not a holder in due course because defen-

dant had notice of the corporation's claims by accepting corporate funds in payment of Winter's personal debts. The Co-op argues that Winter was a fiduciary based on the unstated assumption that a coporate officer has a fiduciary relationship with the corporation.

"Notice" is defined at § 400.1–201(25) as follows:

(25) a person has "notice" of a fact when
(a) he has actual knowledge of it; or
(b) he has received a notice or notification of it; or
(c) from all the facts and circumstances known to him at the time in question, he has reason to know that it exists.

When determining whether a person has notice of a fact under § 400.1–201(25), "nothing short of actual knowledge or bad faith will defeat the title of a holder in due course, although actual knowledge may be inferred from the facts and circumstances surrounding the acquisition of the instrument, but not from circumstances which would merely put a reasonable prudent person on inquiry." *Mid–Continent National Bank v. Bank of Independence,* 523 S.W.2d 569, 573 (Mo.App.1975).

The parties have raised genuine issues of material fact as to whether Polonyi had notice of any claims against the instruments embezzled by Winter. Whether actual knowledge can be inferred from the facts known to Polonyi must be decided by a jury. Therefore, neither plaintiff's nor defendant's Motion for Summary Judgment will be granted on this issue.

Plaintiff argues that a fiduciary relationship existed between Winter and the Co-op. Plaintiff has not persuaded me as a matter of law that a fiduciary relationship existed.

Even if a fiduciary relationship were assumed, a jury issue exists regarding whether Polonyi knew that Winter was using the Co-op's money for his own benefit or other-wise in breach of duty. ("The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty." § 400.3–304(2)).

2. *V.A.M.S. §§ 400.3–406 and 400.3–404*

Polonyi contends that plaintiff's claims are barred by the application of UCC §§ 400.3–406 and 400.3–404.[2] V.A.M.S. § 400.3–406 provides:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

V.A.M.S. § 400.3–404 provides in pertinent part: "(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it...." UCC Comment 4 to § 400.3–404 states in pertinent part:

The words 'or is precluded from denying it' are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; and to recognize the negligence which precluded a denial of the signature....

Plaintiff argues that § 400.3–406 is not applicable because:

[I]t [§ 400.3–406] is designed to protect two very limited classes: (1) holders in due course who take instruments that

---

**2.** Throughout defendant's discussion of the UCC §§ 3–406, 3–403 and 3–404, defendant refers to Kansas statutes and Kansas case law. For reasons previously stated, Missouri law applies. For this reason alone, defendant has failed to establish that there is no genuine issue for trial on plaintiff's claims under the applicable law. However, Missouri has adopted the same UCC provisions that defendant relies on under Kansas law. Therefore, I will briefly discuss why defendant has failed to persuade me that there is no genuine issue for trial on plaintiff's claims.

have been materially altered or have unauthorized signatures, and (2) drawee banks. Since the issue is not an altered instrument or an unauthorized signature and since Polonyi is not a drawee bank, this statute has no relevance to the case. Plaintiff's Response to Defendant's Motion for Summary Judgment at 33.

An issue in this case is whether Winter's signature on instruments transferring Co-op funds to his personal account was authorized. Plaintiff's statement to the contrary is puzzling in light of its contrary arguments elsewhere.

■ Plaintiff's assertion that § 400.3–406 is applicable only to drawee banks is contrary to the terms of § 400.3–406 which permits "other payor[s]" who meet certain qualifications to assert the preclusion defense. Furthermore, § 400.3–406 has been held to apply to payees as well as payors. See cases cited in defendant's Reply Brief at 31–34. Therefore, plaintiff's contention that § 400.3–406 is inapplicable is rejected.

Defendant argues that:

The uncontroverted facts clearly show that the lack of ordinary care exercised by the Board of Directors substantially contributed to allowing Winter's scheme to continue from 1983 through 1985.... Polonyi acting in good faith and in accordance with reasonable commercial standards changed its position and reliance on the payment of checks by Winter through its acts of executing purchases of commodities futures contracts for Winter.

Suggestions in Support of Defendant's Motion for Summary Judgment at 50–51.

For reasons previously stated, genuine issues of material fact exist as to whether the Board acted negligently and as to whether Polonyi was acting in good faith, i.e., as an innocent purchaser, in accepting the instruments. Therefore, defendant's Motion for Summary Judgment based on §§ 400.3–406 and 400.3–404 will be denied.

### 3. V.A.M.S. § 400.3–403; Actual, Implied and Apparent Authority

V.A.M.S. § 400.3–403(1) provides: "A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority." UCC Comment 1 to this section states in pertinent part: "The power to sign for another may be an express authority, or it may be implied in law or in fact, or it may rest merely upon apparent authority. It may be established as in other cases of representation, and when relevant parol evidence is admissible to prove or to deny it."

Defendant argues that "the lack of ordinary care on the part of the Board of Directors, as a matter of law, clothed Winter with ostensible or apparent authority to carry on his trading scheme through Polonyi." Suggestions in Support of Defendant's Motion for Summary Judgment at 59. Defendant also argues that "the facts and circumstances which existed concerning the relationship between the Board of Directors at the Co-op and Winter, depict a situation where both Winter and Polonyi could have very reasonably understood that Winter had authority to trade through Polonyi," i.e., creating implied authority. Defendant's Opposition at 20.

In the alternative, Polonyi argues that the Co-op's "sweeping abdication of its duties and fiduciary obligations essentially amounted to ratification and adoption of Winter's trading through Polonyi."

■ Plaintiff argues that § 400.3–403 is inapplicable to this case because it "discusses an agent's personal liability for signing checks on behalf of his principal and imposes personal liability on the agent if he does not properly identify his principal or sign in his representative capacity." Plaintiff's Response to Defendant's Motion for Summary Judgment at 32. Plaintiff further states that Official Comment 1 to § 400.3–403 "only attempts to clarify that an agent with apparent authority may be subject to personal liability if he does not comply with the statute's provisions." Id.

Plaintiff's argument that § 400.3–403 is inapplicable is not persuasive as applied to § 400.3–403(1). Despite Polonyi's reliance on Kansas rather than Missouri law, there is a genuine issue for trial on the issue of whether Winter had actual, apparent or implied authority to use the Co-op's funds to trade for his own account with Polonyi. Therefore, defendant's Motion for Summary Judgment based on § 400.3–403 and the principles of actual, apparent or implied authority will be denied.

Similarly, the factual record does not permit the conclusion, as a matter of law, that the Co-op ratified Winter's use of the Co-op's funds to trade for his own account.

### IV. *Conclusion*

For the reasons stated, it is hereby ORDERED that:

1) defendant's Motion for Summary Judgment is denied; and

2) plaintiff's Motion for Partial Summary Judgment is denied.