No. 50,476

Michael C. Weigand, *Appellee,* v. Union National Bank of Wichita, *Appellant.*

(610 P.2d 572)

Opinion filed May 10, 1980.

*James J. McGannon,* of Regan & McGannon, of Wichita, argued the cause and was on the brief for the appellant.

*James W. Sargent,* of Sargent, Klenda & Haag, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Herd, J.: This is an action for rescission of the guaranty of a

note and, in the alternative, for damages. Plaintiff, Michael C. Weigand, brought this action against Union National Bank of Wichita for fraudulently concealing information from Weigand thereby inducing him to execute a guaranty of a William Dodson Ltd., Inc. note, to his damage.

A detailed statement of facts is necessary for disposition of this case. William Dodson Ltd., Inc. is a Kansas corporation engaged in the retail clothing business in Wichita. William H. Dodson was president of the corporation. The stockholders were Dodson, Fran Jabara and Donna Jabara. The Jabaras are the brother and sister respectively of Dodson's former wife, Helen. In 1972, Helen and William Dodson filed an action for divorce which caused a rift among the company stockholders. On January 20, 1973, the corporate board of directors was expanded to include Michael C. Weigand and Robert Cornwell in addition to William Dodson, Fran Jabara and Donna Jabara. Michael C. Weigand was elected corporate secretary-treasurer and F. B. Kubik & Company, C.P.A., was employed as corporate accountant.

Due to the divorce, it became necessary for William Dodson to raise capital to pay his wife a property settlement and redeem the stock in the company from Fran and Donna Jabara. In November 1973, William Dodson held discussions with Union National Bank of Wichita with regard to borrowing $110,000. The bank was furnished a letter from F. B. Kubik & Company setting forth a detailed analysis of the corporation's financial requirements and William Dodson's personal financial situation with recommendations regarding the stock redemption and divorce settlement. The refinancing plan presented to the bank provided for redemption of the Jabara stock at book value; conversion of all of William Dodson's personal debts to corporate debts; distribution of William Dodson's share of the corporate undistributed previously taxed income in the amount of $43,640 to him; and termination of the corporation's Subchapter S status. The plan further contemplated that Dodson would pay off his personal note to the bank in the principal amount of $39,000 with his distribution from the corporation. The Bank declined the loan application but agreed to assist the corporation in applying for a Small Business Administration loan. An application was later made to SBA for a loan of $110,000 which was turned down.

In February, 1974, Dodson applied to the bank for another loan

for the corporation, this one in the amount of $60,000. A plan for use of the money, prepared by Kubik and dated February 1, 1974, contemplated redeeming Donna Jabara's stock for $30,367 and paying Helen Dodson the balance of the divorce settlement in the amount of $27,733. Fran Jabara's stock was to be redeemed by giving him a note in the amount of $30,367 drawn on the corporation and guaranteed by Michael C. Weigand payable in one year, secured by Weigand's 3,000 shares of Pizza Corporation of America stock. The plan was to be closed on or before March 1, 1974, and went on to provide:

"1. The corporation will remain a Subchapter S corporation through July 31, 1974, and effective August 1, 1974, will terminate the election.

"2. After the redemption transaction is closed the corporation will make a distribution of substantially all its accumulated earnings to Bill Dodson. The amount of this distribution is estimated at $40,000. The amount will be loaned back to the corporation by Bill Dodson with interest at 10%.

"3. After July 31, 1974, Mike Weigand will buy and Wm. Dodson Ltd., Inc., will sell common stock for $30,367. Mike will acquire the number of shares necessary to produce a corporate book value for the shares of $30,367. The funds received by the corporation will be used to pay the $30,367 note due to Fran Jabara."

On February 18, 1974, the corporation held a special meeting of the board of directors and the following minutes were made of the meeting:

"A special meeting of the Board of Directors of Wm. Dodson Ltd, Inc., was held on February 18, 1974.

"The Chairman of the Board presented the written Resignation of Fran Jabara and Donna Jabara, as members of this Board, and the Secretary was instructed to file it with these minutes.

"Upon motion duly made, seconded and unanimously passed, the President was authorized and instructed to execute and deliver to Fran Jabara the corporation's promissory note, in the amount of Thirteen Thousand Dollars ($13,000.00), a copy of which is attached hereto.

"The President announced that Donna Jabara had offered to surrender all of her stock of this corporation, in consideration for a cash payment of Thirty Thousand Three Hundred Sixty-Seven Dollars ($30,367.00). Upon motion duly made, seconded and unanimously passed, said offer was accepted.

"The President announced that Fran Jabara had offered to surrender all of his stock of this corporation, to this corporation, if this corporation would execute and deliver to him its promissory note, in the amount of Thirty Thousand Three Hundred Sixty-Seven Dollars ($30,367.00), a copy of which is attached hereto. Upon motion duly made, seconded and unanimously passed, said offer was accepted and the President was authorized and directed to execute and deliver said promissory note.

"Upon motion duly made, seconded and unanimously passed, the salary of the

President was increased to Two Thousand Two Hundred Dollars ($2,200.00) per month, effective as of March 1, 1974.

"Upon motion duly made, seconded and unanimously passed, it was determined that, effective as of March 1, 1974, this corporation should pay William H. Dodson ten percent (10%) interest on the Twenty Thousand Dollar ($20,000.00) loan.

"Upon motion duly made, seconded and unanimously passed, it was determined that this corporation should borrow Sixty Thousand Dollars ($60,000.00) from the Union National Bank of Wichita, and the President was authorized and directed to consumate [sic] said loan and to execute any and all documents required by said Bank, including Security Agreements covering all personal property, both tangleable and intangleable [sic], owned by this corporation.

"There being no further business for consideration, the meeting was adjourned.

/s/ Michael C. Weigand
Michael Weigand, Secretary"

Dodson then asked the bank to renew his personal note in the amount of $40,000, suggesting funds would be available from the corporation's Christmas sales to retire his personal obligation. The money to pay off the corporate note to Fran Jabara for stock redemption was to come from the $30,367 stock purchase by Michael C. Weigand after the Subchapter S status had terminated on July 31, 1974, as was stated in the plan presented by Kubik. The bank made the $60,000 loan to the corporation on February 25, 1974, and renewed Dodson's personal note in the amount of $40,000.

Upon receipt of the $60,000 loan proceeds, Donna Jabara's stock was redeemed and the divorce settlement was paid to Helen Dodson. Fran Jabara's stock was redeemed in exchange for a promissory note in the amount of $30,367 from the corporation guaranteed by Dodson and Weigand, dated February 23, 1974, due and payable in one year. As security for his guaranty of the corporate note, Weigand deposited in escrow 3,000 shares of stock in Pizza Corporation of America in the bank and executed an escrow agreement with Jabara and the bank. The escrow agreement provided if the note was paid when due the stock would be redelivered to Weigand. If not, the stock would be delivered to Jabara.

Thereafter, around November 1, 1974, the corporation began having difficulty collecting its accounts receivable which drastically affected its cash flow. As a result, the bank purchased the corporate accounts receivable at a 3% discount and began collecting them under an arrangement they termed a "private label

system." Before purchase of the accounts, the bank loaned the corporation $50,000 on a demand note to be paid in full by December 31, 1974.

On December 13, 1974, the bank debited the corporate checking account in the amount of $35,000 and applied the proceeds to William Dodson's personal $40,000 note. The bank again debited the corporation account on January 3, 1975, for $5,024.73 and paid the balance on the Dodson note.

On January 10, 1975, Dodson requested a new $25,000 loan for the corporation from Richard Goodin, vice-president of the bank's consumer loan division. At that time, Dodson advised Goodin his personal note had been paid. Goodin made the new loan to the corporation and took its demand note. By January 23, 1975, the $25,000 loan had been reduced to $10,500, and Dodson obtained an additional corporate loan in the amount of $55,000, executing a new demand corporate note for $65,000 and cancelling the previous note for $10,500.

On January 28, 1975, the corporation executed and delivered to the bank yet another note in the amount of $5,000 due March 31, 1975.

On March 3, 1975, the bank loaned the corporation the $41,400 which is the subject of this litigation. Weigand guaranteed the loan and pledged his Pizza stock as security.

The corporation note to Fran Jabara guaranteed by Weigand and secured by his Pizza stock was due February 23, 1975. Jabara demanded to be paid. Dodson spoke with Jack Hinkle, board chairman of the bank, about the bank making the corporation an additional loan of enough to pay off the note to Jabara. Hinkle and Goodin claim they were socializing at The Wichita Club sometime in the last week in February, 1975, when Weigand approached them to state if the bank would loan the corporation funds to retire the Jabara note, Weigand would guarantee the loan and continue the Pizza stock pledge, which was already in escrow at the bank, as security for the bank loan. Hinkle claims he advised Weigand he and Goodin would put the loan through. Weigand made no inquiry about the present amount of outstanding corporate indebtedness to the bank. Weigand testified he did not remember the Wichita Club meeting but that the subject of a $41,400 loan had been discussed earlier that week when Dodson and Weigand had gone to Hinkle's office to request the loan.

Hinkle testified he did not recall any such meeting. Weigand further claims Hinkle told him if he would pledge his Pizza stock the bank would loan the corporation sufficient money to pay the Jabara note. Weigand claims the bank's actions were done without authority from the corporation, its officers or directors. He claims the bank knowingly concealed these transactions with the intent to deceive him and the transactions hastened the demise of the corporation. In addition, he argues the statements made by Hinkle and Goodin during the holiday season of 1974-1975 regarding the corporation's financial status were fraudulent statements to induce him to guarantee a note from a corporation known by Hinkle and Goodin to be financially unstable. Weigand requests the court to return his stock to him. In the alternative, he demands judgment for the amount of the note, plus interest, the costs of the action and punitive damages in excess of $10,000.

The bank responded by denying Weigand's allegations and alleging Weigand, as an officer and director of the corporation, had notice and knowledge, actual and constructive, of all transactions between the corporation and the bank. Appellant states the debiting of the corporate account was authorized by the second financing plan and the transactions were clearly shown on the bank statement sheets which were sent to the corporation. The bank claims Weigand consented to, acquiesced in, approved, ratified and confirmed all transactions of the corporation as its secretary. The bank also alleges that Weigand signed a written instrument certifying to a corporate resolution authorizing Dodson to borrow money from the bank to pay the proceeds of the loans and discounts as directed by Dodson. The bank further alleged it relied on the corporate resolution, loaned the money and extended credit in good faith. Finally, the bank alleged any statements made by Hinkle and Goodin were made as a part of social conversations and were not material facts, merely hopeful opinions regarding the corporation's financial status. The bank counterclaimed against Weigand for $41,400 and requested that the Pizza stock be sold and applied to the debt.

After a pretrial conference on January 12, 1978, the case was tried to the court on March 28, 1978. The court granted judgment to the bank on the question of fraud, but granted Weigand rescission of his guaranty and judgment against the bank on its counterclaim. The bank appealed from that portion of the judgment granting rescission and denying its counterclaim.

The issue before us is whether the bank fraudulently misrepresented the corporation's financial condition to Weigand, thereby inducing him to guarantee the note. The law with respect to actionable fraud was recently set forth in *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980), where the court stated:

"Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury and damage. [Citations omitted.]

"We have held fraud is never presumed and must be proven by clear and convincing evidence. [Citations omitted.] The term 'clear and convincing evidence' means:

'[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.' [Citation omitted.]"

Did the bank knowingly make untrue statements of material facts, known to be untrue or made with reckless disregard for the truth, which were of such a character that Weigand had a right to rely on them and did rely to his detriment? In *Goff v. American Savings Association,* 1 Kan. App. 2d 75, 78, 561 P.2d 897 (1977), the court said, "The statement must have been of such a nature that it was reasonably calculated to deceive the Goffs and to induce them to do what they otherwise would not have done."

The record reveals the following information about Michael C. Weigand: He is 45 years old and is engaged in the real estate business in Wichita as a partner in the firm of J. P. Weigand and Sons. He has been in the real estate business for 21 or 22 years and specializes in developing shopping centers through the firm's commercial and industrial department. Weigand has been involved with the development of several shopping centers including the Mall, Twin Lakes, Towne East and Pawnee Plaza. As a real estate developer, he supervises salesmen, works with retailers in leasing space, buying land and buildings. His work includes studying contracts and leases, and obtaining financing for clients by working with banks and other lending institutions.

The record also reveals Weigand was not a customer of the Union National Bank as he and his firm have their accounts in other banks. In his capacity as secretary-treasurer of William Dodson Ltd., Inc., Weigand attended the corporate board meet-

ings, kept minutes, signed the necessary documents for the corporation and kept abreast of its financial affairs. At trial, Weigand testified the corporate accountant, J. Fred Kubik, kept the books but that he had discussed corporate finances with Kubik and saw the Kubik letters of November 9, 1973, and February 1, 1974, setting forth future financial plans for the corporation.

Weigand testified the bank sent the corporation checks, bank statement sheets and deposit slips to the corporate address each month and they were delivered to Kubik, but were available for him to see if he desired. Weigand stated, however, that he didn't understand such financial matters and his own accountant took care of his personal bank statements for him.

With respect to the bank's actions in debiting the corporate account in the amount of $40,000 and applying the money to Dodson's personal indebtedness, we find Weigand to be a successful entrepreneur, trained and experienced in business matters, capable of analyzing contracts and leases. The record reveals he knew from Kubik's letter of February 1, 1974, that Dodson was to receive $40,000 of the accumulated earnings of the corporation after the redemption of Donna Jabara's stock.

On February 25, 1974, Weigand signed an unrevoked corporate resolution giving Dodson complete authority over corporate borrowing, which provided in part:

"FURTHER RESOLVED, That said Bank be and it is hereby authorized and directed to pay the proceeds of any such loans or discounts as directed by the persons so authorized to sign, whether so payable to the order of any of said persons in their individual capacities or not, and whether such proceeds are deposited to the individual credit of any said persons or not."

The redemption occurred February 26, 1974; the distribution of corporate money took place December 13, 1974, and January 3, 1975. The debit method of distribution, while an irregular technique, could come as no surprise to Weigand. As an officer of the corporation he is charged with knowledge of that plan. A simple inspection of the bank statements would have shed more light on the transaction about which he claims he knew nothing. Additionally, the knowledge Weigand is presumed to have officially as corporate secretary-treasurer, he is conclusively presumed to have as a private individual. 3 Fletcher Cyclopedia Corporations § 836 (1975).

Weigand claims he was not required to perform an extensive

examination of the monthly bank statements in order to discover a fact which was concealed from him. He seeks to place himself in the position of the defendant director in *Harman v. Willbern,* 374 F. Supp. 1149 (D. Kan. 1974). That case dealt, in part, with the extent of a director's fiduciary duty to the corporation and is not applicable to the present claim of fraudulent concealment of a material fact.

Turning to the statements allegedly made by Hinkle and Goodin, we note there is a dispute as to how many statements were made, where they were made and who initiated them. Weigand states that on two occasions in Hinkle's office and during one occasion at The Wichita Club, Hinkle stated the corporation was doing well and that he was "proud of Bill Dodson." Weigand claimed Hinkle told him time and time again that "everything was in good shape." Goodin is alleged to have agreed with those statements. The circumstances of fraud must be pled with particularity (K.S.A. 60-209[*b*]) and we cannot say the statements of Hinkle and Goodin rose to the level of clear misrepresentations of material fact. The most that can be said of these statements to Weigand is that they were hopeful opinions about a company Hinkle regarded as being on the upswing. The confidence the two men expressed in the future of the company was reflected in the bank's attitude toward the company's financial condition. The bank continued to lend the company money up until May, 1975, only two months before the company closed its doors. This does not suggest a bank conspiracy to induce Weigand to salvage a dying enterprise. The trial court's finding that the statements were misleading but not fraudulent is based on the fact that the trial court took judicial notice of Hinkle's good character and reputation for honesty. The trial court believed any opinion rendered by Hinkle as a businessman would carry considerable weight and influence and Weigand would not have signed the guaranty had it not been for Hinkle's representations regarding the corporation's financial condition. It is improper for a trial court to take judicial notice of the reputation of a particular individual. 29 Am. Jur. 2d, Evidence § 122. Personal reputation is not a matter of such "generalized knowledge" that it cannot reasonably be the subject of dispute. K.S.A. 60-409. See, *e.g.,* 1 Jones on Evidence § 2:8 (6th ed. 1972).

In *Noll v. Boyle,* 140 Kan. 252, 255, 36 P.2d 330 (1934), this

court quoted with approval the following language from 14a C.J. 100:

"The directors of a corporation are chargeable with knowledge of . . . such corporate affairs as it is their duty to keep informed of, of the financial condition of the corporation; and of facts which the corporate books and records disclose."

In addition, one who alleges fraud is not entitled to relief if he could have "ascertained the truth by ordinary care and attention and his failure to do so was the result of his own negligence." 37 Am. Jur. 2d, Fraud and Deceit § 248, p. 330.

We find Michael C. Weigand as a director and secretary-treasurer of William Dodson Ltd., Inc., is chargeable with knowledge of the financial condition of the corporation. In addition, in the absence of detailed knowledge, he could readily have ascertained the corporation's financial health by reviewing the records entrusted to his care.

Finally, in addition to the fact that the statements did not constitute clear representations of material facts, there is no substantial evidence to show Weigand placed the requisite amount of reliance upon those statements to do what he otherwise would not have done. The scenario appears clear to us: Weigand had guaranteed a corporate note to Jabara in the amount of $30,367 with a pledge of his Pizza stock in 1974. The note came due and Jabara demanded payment. Weigand would have lost his stock unless the note had been paid. The corporation did not have the resources to pay Jabara. Weigand was aware of those facts and sought a bank loan for the corporation in order to salvage his corporate stock. The corporation had given Jabara two notes, the one Weigand originally guaranteed and another for $13,000. The bank agreed to lend enough to discharge both notes and "get Fran Jabara out of the corporation," if Weigand would guarantee a $41,400 note. Weigand agreed and pledged his Pizza stock. Within a few months the corporation closed its doors and both the corporation and Dodson went bankrupt. Naturally, under such circumstances, Weigand wished to withdraw his commitment.

In *Nordstrom v. Miller*, 227 Kan. at 65, we stated:

" 'The existence of fraud is ordinarily a question of fact.' An appellate court's review 'is limited to determining whether the trial court's finding is supported by competent evidence when that evidence is weighed in a manner most favorable to supporting the trial court's determination.' [Citations omitted.] This court is 'not concerned with the credibility of witnesses or the weight of their testimony,

and the trier of facts, not the court of appellate review, has the responsibility of determining what testimony should be believed.' [Citation omitted.]"

In light of his corporate position which allowed access to all financial information, coupled with the absence of clear and convincing evidence the bank made representations with reckless disregard for the truth we cannot say Weigand was fraudulently induced to guarantee the note to the bank. We hold there is no substantial evidence to support the judgment of the trial court and it is reversed with directions to enter judgment for the Union National Bank in the amount of $41,400 with interest and the costs of the action.

In light of the foregoing, it is unnecessary to rule on other issues presented in the briefs. The judgment of the trial court is reversed.

HOLMES, J., not participating.