2002 WY 83

**James R. ALEXANDER and Rita J. Alexander, husband and wife, Appellants (Defendants),**

v.

**Donald J. MEDUNA and Linda Meduna, husband and wife; and Donald Meduna, Trustee of the Meduna Red Angus Ranch Trust, dated December 11, 1996, Appellees (Plaintiffs).**

No. 00–324.

Supreme Court of Wyoming.

May 30, 2002.

Micheal K. Shoumaker, Westminster, Colorado; and Virgil G. Kinnaird, Sheridan, Wyoming, Representing Appellants.

Joseph E. Darrah and S. Joseph Darrah of Darrah & Darrah, P.C., Powell, Wyoming, Representing Appellees.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] James and Rita Alexander (the sellers) sold their home of many years to Donald and Linda Meduna and Meduna Red Angus Ranch Trust (the buyers). Before contracting, the buyers viewed the property and were advised by the sellers there was no groundwater seepage or structural defects. The basement flooded shortly after the buyers took possession. At the bench trial, an engineer testified he discovered evidence of long-term structural damage under paneling and carpet and in crawl spaces. The trial court found the sellers' fraudulent representations induced the buyers to contract and awarded punitive damages. We affirm in part, reverse in part, and remand for correction of the compensatory damages associated with the Northwest Rural Water District hookup.

## FACTS

[¶ 2] In February 1996, the sellers listed their home of over twenty years, including approximately forty acres of land, a residence, and a mobile home office, for sale through Alexander Realty with Mrs. Alexander as the listing broker. The buyers and their real estate agent first viewed the property on or about December 9, 1996.

[¶ 3] The real estate agent prepared a purchase offer for the buyers within approximately one day of the first property showing. A copy of a property condition statement completed by Mrs. Alexander was delivered to the buyers before they made their first offer and was attached to all offers that went back and forth between the parties.

[¶ 4] The buyers' original proposed contract to purchase was submitted on or about December 11, 1996. The sellers counteroffered the same day, and the buyers accepted on December 12, 1996, with some additional terms. The contract provided standard form language regarding the buyers' right to inspect the property.[1]

---

1. Buyer or Lender may obtain, at no expense to Seller, electrical, mechanical, structural, environmental and/or other inspections of the property by qualified professional inspectors and/or engineers, and shall pay for any damage to Seller's property caused by such inspectors and/or engineers.... Unless Seller receives written notice, signed by Buyer on or before January 15,

[¶ 5] The buyers did not have professional inspections performed. The property closing occurred on or about April 11, 1997, and the buyers did not take physical possession until approximately June 10, 1997, because they had to complete personal business and make moving arrangements.

[¶ 6] In the latter part of June 1997, the buyers experienced a number of problems including flooding in the residence basement, roof disrepair, and leakage in the mobile home office; the inability to grow any produce in the garden; and the discovery the Northwest Rural Water District hookup costs would be in excess of $8,000. They filed a lawsuit against the sellers seeking recovery on two causes of action: (1) fraud and deceit and (2) infliction of severe emotional distress.[2] After a lengthy bench trial, the trial court found the buyers had proved the sellers' multiple, intentional fraudulent misrepresentations by clear and convincing evidence but had not established intentional infliction of emotional distress by a preponderance of the evidence. Subsequent to a punitive damages hearing, the trial court awarded the buyers judgment and damages of $100,840.94, attorney fees of $38,045, costs of $9,228.42, and punitive damages of $25,000. The sellers appealed.

### STANDARD OF REVIEW

[¶ 7]

"When a trial court in a bench trial makes express findings of fact and conclusions of law, we review the factual determinations under a clearly erroneous standard and the legal conclusions *de novo*." *Rennard v. Vollmar*, 977 P.2d 1277, 1279 (Wyo.1999). This court does not weigh the evidence *de novo;* therefore, findings may not be set aside because we would have reached a different result. Moreover, the appellant bears the burden of persuading the appellate court that the finding is erroneous.

1997, 5:00 p.m. (Objection Deadline) of any defect(s) identified by inspectors or engineers that Buyer is requesting to be repaired, the physical condition of the property shall be deemed to be satisfactory to Buyer.

*Schlesinger v. Woodcock*, 2001 WY 120, ¶ 13, 35 P.3d 1232, ¶ 13 (Wyo.2001) (some citations omitted); *see also Polo Ranch Company v. City of Cheyenne*, 969 P.2d 132, 136 (Wyo. 1998).

[¶ 8] We will not supplant the fact-finder, but, in reviewing the sellers' arguments, we must keep in mind the elements of intentional misrepresentation (fraud) and the requisite clear and convincing standard of proof. *Dewey v. Wentland*, 2002 WY 2, ¶ 10, 38 P.3d 402, ¶ 10 (Wyo.2002); *Sundown, Inc. v. Pearson Real Estate Company, Inc.*, 8 P.3d 324, 330 (Wyo.2000). Intentional misrepresentation is established when three elements are proven: "(1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages." *Sundown, Inc.,* 8 P.3d at 330.

### DISCUSSION

#### A. Summary of Evidence

[¶ 9] At trial, the buyers' expert witness, a registered professional engineer, testified regarding his July 1997 inspection of the property, his written report based on that inspection, and what, in his opinion, caused the structural damages and defects. The gist of his testimony was that the problems had existed for a long period of time. He noted evidence of water damage in the basement including heavy salt deposits and peeling paint on the basement walls, extensively rusted and corroded heat registers, spalling of the masonry and significant alkali deposits in the west crawl space, and bulging of the east and west walls. The engineer opined that excessive migrating groundwater and inadequate subsurface drainage away from the residence existing for not less than three to five years caused water to permeate the inadequately damp proofed foundation walls, swelling the soil and causing the east and west walls to buckle inward. He also

2. These are the causes of action set out in the buyers' amended complaint.

concluded the damage was not caused by excessive lawn watering. He testified the foundation walls would have to be exposed, sandblasted, and damp proofed to prevent complete failure. This would require emptying the basement; removing the electrical wiring, plumbing, and carpeting; and excavating the soil from the foundation perimeter. · Cracks and heaves in the basement floor would likewise need repair. He noted the excavation would disrupt the existing landscaping which would require repair after the foundation was secured. The engineer also testified the mobile home office roof was in poor condition. Significant leaks and buckling in the roof would require extensive repairs. In the interior northwest corner of the mobile home office, an additional layer of sheetrock had been installed on the ceiling which concealed signs of water leakage.

[¶ 10] An experienced building contractor testified he saw bulging of the east basement wall which was causing the center wall support to move and the center-bearing wall to wrinkle at the basement ceiling. He also observed cracks and heaves in the floor, metal heat registers severely rotted from water and salts coming through the walls, and heavy salt deposits on the walls where the buyers had removed the paneling just after they moved into the house.

[¶ 11] Mr. Meduna and his real estate agent testified that the sellers knew the buyers needed to generate supplemental income from the property by using the mobile home office as a business and selling produce and crops from the garden and other acreage. Before entering into the contract, the sellers showed them around the property including the residence, a separate workshop, the mobile home office, the garden, the irrigated acreage, and a pig barn. The sellers each made representations regarding the property condition and suitability for the buyers' stated needs. Neither Mr. Meduna nor his agent saw visible evidence of water damage. They were not shown the crawl spaces, and the walls of two bedroom closets could not be seen because they were covered over by boxes and other items. During the showing, as witnessed by the real estate agent, the sellers represented to the buyers that: (1) the

basement had water leakage due to a water softener defect and a downspout malfunction, both of which had been repaired; (2) the garden had been fertilized and was sufficiently productive to permit Mrs. Alexander to can produce; and (3) Northwest Rural Water District water could be accessed at the property line by the road for approximately a $2,000 tap fee and a $1,500 trench cost. The buyers received the property condition statement listing only the two repaired leakage incidents prior to making their initial offer. That statement also provided:

> The undersigned Seller ... completes and executes this Addendum to such listing contract in order to comply with Seller's obligation to reasonably discover and fully disclose to all parties any and all information regarding the condition of such property, does hereby make the following statement and representation concerning the present description and condition of subject property.

The buyers relied heavily on the sellers' oral and written representations of the property condition in making an offer to purchase and believed the disclosures were honest and complete.

[¶ 12] Mr. Meduna testified about how he first became aware of the water problem in the basement and the steps he took to have it evaluated and repaired. He testified as to advice he received regarding the garden and the fact the soil had been sterilized through use of a weed killing chemical, about how he became aware of the Northwest Rural Water District hookup costs, and regarding the steps he took to mitigate the damage to the house, garden, and mobile home. He also stated these efforts were hampered by the buyers' lack of sufficient finances to adequately correct all the defects.

[¶ 13] The sellers' former housekeeper testified that, approximately six years prior to the house sale, she periodically cleaned salt residue off the basement carpet. The former owner of the home testified that, during the time he lived in the home, he installed paneling in only one basement bedroom and did no other paneling or painting; the groundwater level was significantly below

the foundation level; and there were no irrigation lines in place.

[¶ 14] Mrs. Alexander initially testified she was unaware of any excessive water issues in her former home. However, she later admitted the sellers recarpeted the basement many times during their twenty-year residency but denied that the frequent replacement was due to excessive groundwater leakage. She acknowledged as a realtor she was aware that sellers are required to fully disclose any known property defects on the property condition statement. She also eventually acknowledged she was aware of the salt buildup on the basement walls and this was a defect she had failed to disclose. Mrs. Alexander initially testified the sellers did not panel or paint the basement prior to offering the property for sale but then equivocated stating she was not sure whether they had made the improvements. She testified the water leakage could have come from over watering the lawn or wet weather and she had advised the buyers not to water the lawn area for more than fifteen minutes at a time. She acknowledged she told the buyers she had grown and canned produce from the garden and still had canned goods in the basement. However, she admitted this was over ten years ago and did not specifically recall whether she had advised the buyers of this fact.

[¶ 15] Mr. Alexander similarly denied knowledge of the water leakage issue or efforts on his part to conceal the water damage through cosmetic repairs of the walls and floors. His testimony regarding paneling and painting was equivocal as well. In due course, he conceded he was aware of the salt deposits and did not advise the buyers of this orally or on the property condition statement.

## B. Summary of Trial Court Findings of Fact

[¶ 16] In a decision letter dated January 26, 2000, the trial court set out thirty-one detailed findings of fact. We present these in summary fashion: The trial court found the buyers' expert witness was qualified to present technical evidence regarding the condition of the property, causation of structural damages, and defects. This testimony was deemed credible and unrefuted. Conversely, the trial court found Mr. Alexander testified in a conflicting manner regarding certain matters and rejected portions of his testimony. Further, certain aspects of the sellers' testimony, by which they endeavored to exonerate their misrepresentations and failure to disclose, were found not to be credible.

[¶ 17] The trial court determined: (1) The sellers were, or reasonably should have been, aware of, and failed to disclose, defects and damage to the basement foundation, walls, floor, and heat registers; (2) the sellers bolstered the buyers' trust in their representations through statements during the initial showing that two excessive water incidents had been corrected and by pointing out an indention of the living room floor; (3) undisclosed leaks and buckling in the mobile home office would require extensive repairs; (4) the sellers were aware of the buyers' interest in water from Northwest Rural Water District and represented the fees would be $3,500, though the actual expense was in excess of $8,000; (5) the sellers failed to disclose the garden had not grown crops in ten years and soil sterilizing weed killer had been applied; (6) the buyers relied on the property condition statement representation that the identified problems had been fully repaired and there were no other defects whatsoever; and (7) neither the preprinted contract nor the standard inspection clause language was negotiated. The trial court found the clear and convincing evidence demonstrated the sellers made material misrepresentations regarding structural defects, both verbally and through the property condition statement, and breached their duty to disclose all defects which, if known, would have caused the buyers not to rely upon the property condition statement and, to their detriment, subsequently purchase the property.

[¶ 18] In contrast, the trial court determined the buyers (A) acted in good faith and reasonably relied on the sellers' representations in purchasing the property; (B) were attentive at the initial showing; and (C) believed, as did their real estate agent, that the information disclosed in the property condi-

tion statement was candid and accurate. Despite reasonable efforts to mitigate the damages, the buyers sustained special and specific damages for repair and restoration in the total amount of $100,840.94,[3] attorney fees, and costs. The trial court further found the sellers' conduct was willful, wanton, and in reckless disregard of the buyers' rights which entitled the buyers to a hearing on punitive damages.

## C. Was Finding of Intentional Misrepresentation Supported by Clear and Convincing Evidence?

[¶ 19]   The sellers contend the trial court's finding of clear and convincing evidence of fraud was erroneous due to its reliance on an unqualified expert, the failure to disclose does not constitute fraudulent misrepresentation, the duty to disclose was delegated to the buyers by contract, and fraud was not established by the evidence.

### i. The Expert Witness "Daubert" Objection

[¶ 20]   Prior to trial, the sellers apprised the trial court of their objection to the buyers' expert witness' testimony alleging he was unqualified and failed to perform certain tests to confirm his opinion. During the course of the engineer's testimony, the objection was renewed with regard to admission of his written report. The court overruled the motion stating it would decide what weight, if any, the report should be given after it had received all the evidence. As is apparent from the court's opinion letter and findings, the testimony and report were ultimately accorded considerable weight.

[¶ 21]   As noted by the sellers, we have adopted the federal *Daubert* model, imposing gatekeeping responsibilities on trial courts to decide whether scientific or technical expert testimony is admissible. *Chapman v. State*, 2001 WY 25, ¶ 8, 18 P.3d 1164, ¶ 8 (Wyo.2001); *Bunting v. Jamieson*, 984 P.2d 467, 471 (Wyo.1999) (citing *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).   However, as recently reiterated in *Chapman*, we did not " 'abandon our own precedent regarding the admissibility of expert testimony.' " 2001 WY 25, ¶ 8, 18 P.3d 1164 (quoting *Bunting*, 984 P.2d at 471). "Under the *Daubert* model, the trial court must first determine whether the expert's methodology is reliable; then the court must determine whether the proposed testimony 'fits' the facts of the particular case." *Id.* In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court further clarified the scope of *Daubert*, holding the gatekeeping duties of the trial judge apply to all expert testimony, whether such testimony is based on scientific, technical, or other specialized knowledge. *Smith v. Ingersoll–Rand Company*, 214 F.3d 1235, 1243 (10th Cir.2000). *Kumho* also made it clear the gatekeeping function is a flexible and commonsense responsibility. The trial judge is granted broad latitude in deciding the means to determine reliability as well as in ultimately deciding whether the testimony is reliable. *Id.* (citing *Kumho Tire Co., Ltd.*, 526 U.S. at 141–42, 119 S.Ct. 1167).

[¶ 22]   The *Daubert* gatekeeping function is not intended to measure every expert by an inflexible set of criteria but rather is to ensure an adequate inquiry to " 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " *Id.* (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 152, 119 S.Ct. 1167). We agree that, as gatekeepers of expert testimony, judges must always perform some form of reliability analysis; however, we have overtly declined to " 'shackle the district court with a mandatory and explicit' " reliability proceeding. *Chapman*, 2001 WY 25, ¶ 23, 18 P.3d 1164 (quoting *Hoult v. Hoult*, 57

---

**3.**  The findings break these damages out as follows: $3,571.94—Big Horn Carpet One; $70,371—Bromley Construction & Log Homes; $10,350—Dewey's Auto Salon, LLC (damp proofing basement floor); $4,500—Paul Hansen's Mobile Homes; $948 Nielsen Plumbing & Heating, Inc.; $2,978—Northern Gardens (relandscaping after construction repairs); $8,122—Northwest Rural Water District.

F.3d 1, 5 (1st Cir.1995)). "Instead, ... we 'assume that the district court performs such an analysis *sub silencio* throughout the trial with respect to all expert testimony.'" *Id.* (quoting *Hoult*, 57 F.3d at 5). The decision to admit or reject expert testimony is exclusively within the trial court's discretion. *Id.* at ¶ 8, 18 P.3d 1164; *Seivewright v. State*, 7 P.3d 24, 29 (Wyo.2000).

[¶ 23]   At trial, the buyers' expert testified at length regarding his educational background in civil engineering and experience designing and inspecting residential buildings. He testified he had been a consulting engineer in "self-practice" for approximately eight years in the Cody area. In that time, he had completed more than fifty building inspections to determine whether there was water permeation damage to basements made of concrete block and concrete. He explained the inspection process and that a "normal" inspection does not entail tearing off paneling, running soil or cement samples, or performing other invasive procedures. The engineer then specifically and incrementally described his July 1997 inspection of the property and his final conclusions.

[¶ 24]   The sellers have the burden to demonstrate admission of this evidence was an abuse of discretion, and, upon our review, we must conclude they have failed. At a minimum, they should have provided evidence contesting the validity of the methodology and the reliability of the results. This was not the course they chose at trial; therefore, their appeal presents little more than unfounded assertions. Due regard is given to the trial judge's opportunity and ability to assess credibility, and our review does not entail weighing disputed evidence. *Scherer Construction, LLC v. Hedquist Construction, Inc.*, 2001 WY 23, ¶ 30, 18 P.3d 645, ¶ 30 (Wyo.2001); *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993). The evidence in the record supports the findings that the engineer was qualified and his testimony was relevant and reliable. The trial court appropriately overruled the objection and advised the parties it would determine the weight the evidence was to be given at the close of the trial. We conclude the trial court's analysis was conducted *sub silencio* through the course of the proceeding and in light of all the evidence received. Admission of the expert testimony and report was not clearly erroneous or an abuse of discretion.

### ii. Failure to Disclose as Evidence of Fraud

[¶ 25]   The sellers contend failure to disclose a fact does not constitute fraud. However, they ignore the reality that they acknowledged making a number of false statements. It is in light of these false statements that the nondisclosures became part and parcel of the fraudulent acts:

> Conduct or words which tend to produce an erroneous impression may satisfy the plaintiff's burden. *In addition, even if someone is not under a duty to speak, if he does speak, he is under a duty to speak truthfully and to make a full and fair disclosure.* Reliance is reasonable when false representations have occurred prior to the execution of the contract which is sought to be avoided or for which damages are sought to be recovered.

*Sundown, Inc.*, 8 P.3d at 330–31 (emphasis added and citations omitted). By way of example, Mrs. Alexander acknowledged the sellers' duty to complete the property condition statement honestly and fully. Both sellers acknowledged they knew of the salt deposits, and yet they failed to disclose this information on the property condition statement, thereby making an affirmative false statement. Likewise, they admitted they advised the buyers of two specific excess water incidents but failed to advise them of any other defects. They also acknowledged saying the garden was in good condition but not advising the buyers the soil had been sterilized and nothing had been grown in over ten years. The trial court determined the sellers' disclosures, both verbally at the initial showing of the property and in the written property condition statement, reinforced the buyers' confidence the property was in good condition as the sellers reported.

[¶ 26]   The foregoing list of the sellers' misleading statements and actions is by no means all-inclusive; rather, it is merely illustrative of the definitive point that, regardless

of whether there was a duty, once the sellers started making disclosures, they had a duty to do so completely and truthfully. The disclosures and concomitant duty preceded the buyers' determination to make the initial offer to contract and all parties' entering into the ultimate contract to purchase. On the basis of our holding in *Sundown, Inc.* and the facts of this case, the sellers' contention that their failure to disclose cannot constitute fraud is without merit.

[¶ 27] The sellers maintain no evidence was presented to prove positive acts of fraudulent concealment. This argument is really something of a nonsequitar. No cause of action for fraudulent concealment was pleaded. Rather, the cause of action was fraudulent misrepresentation, and conduct or words which tend to produce an erroneous impression satisfy the plaintiff's burden. *Sundown, Inc.*, 8 P.3d at 330. The evidence established the foundation defects and damage were physically concealed and cosmetically repaired. To the extent this conduct tended to produce an erroneous impression, it supported the cause of action as pleaded.

### iii. Effect of the Contract Inspection Clause

[¶ 28] The sellers also contend the duty to disclose was somehow delegated to the buyers by contract. This argument puts the proverbial cart before the horse. The fraudulent misrepresentations, as determined by the trial court, occurred before the contract was entered into and were the inducement to enter into the contract reasonably relied upon by the buyers. The fact that, once they entered into the contract, the "as is" clause and inspection provisions were in effect did not excuse or nullify the original fraudulent representations, intended inducement, and reasonable reliance which led to the contract being made. An "as is" clause will not relieve the sellers of liability in the case of an actual misrepresentation or fraud. *Richey v. Patrick*, 904 P.2d 798, 803 (Wyo. 1995).

### iv. Clear and Convincing Evidence Standard

[¶ 29] Consideration of the preceding issues leads us to the overarching issue of whether the evidence relied upon by the trial court reaches the level of clear and convincing evidence of fraud. Clear and convincing evidence is the "kind of proof which would persuade a trier of fact that the truth of the contention is highly probable." *MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830, 839 (Wyo.1980); *see also Dorr v. Wyoming Board of Certified Public Accountants*, 2001 WY 37, ¶ 8, 21 P.3d 735, ¶ 8 (Wyo.2001); *Meyer v. Norman*, 780 P.2d 283, 291 (Wyo.1989). Evidence which is of such a nature that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a disputed fact is, of necessity, clear and satisfactory. *RS v. Johnson County Department of Family Services (In re JL)*, 989 P.2d 1268, 1271 (Wyo.1999); *Thomasi v. Koch*, 660 P.2d 806, 811–12 (Wyo. 1983); *Continental Sheep Co. v. Woodhouse*, 71 Wyo. 194, 256 P.2d 97, 99 (1953). This definition, although broad and subjective in nature, in most circumstances provides sufficient guidance to the finder of fact. *Meyer*, 780 P.2d at 291. We have also adopted more objective criteria for clear and convincing evidence with respect to witnesses' testimony:

> "[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue." *Weigand v. Union National Bank of Wichita*, [227 Kan. 747], 610 P.2d 572, 577 (Kan.1980).

*Id.*

[¶ 30] The buyers' trial evidence had sufficient character and integrity to meet the objective "clear and convincing" evidence standard described in *Weigand*. The buyers' witnesses testified very specifically and precisely. None of their witnesses, except Mr. Meduna and perhaps his real estate agent, had any personal interest or apparent bias. Their testimony was internally consistent and corroborated other testimony and evidence received.

[¶ 31] On the other hand, the sellers' testimony was fraught with internal inconsistencies, and even acknowledgement of some degree of misrepresentation and failure to disclose. In fact, it is apparent from the cold transcript the trial court disregarded significant portions of their testimony because of its flawed and untruthful nature. For example, Mrs. Alexander could not remember when or why they had frequently replaced the basement carpet although not an inconsequential expense. Further, neither of the sellers testified consistently on the improvements made to the basement including the paneling and painting despite the fact the property condition statement reflected they performed the work themselves. Called on rebuttal, the former owner testified he had paneled only one bedroom and did not paint the basement. In addition, the sellers first testified they were not aware of any defects. Thereafter, they both partially recanted stating they were aware of such things as the salt deposits but did not consider them defects. In the end, they conceded to some extent they had failed to fully disclose the true property condition.

[¶ 32] Further, the sellers provided no evidence or expert witness to challenge the qualifications or expertise of the buyers' expert, the integrity of his inspection method, or his observations and conclusions. The trial court accurately found this evidence was unrefuted.

[¶ 33] Upon our review, we conclude the trial court's findings fairly and accurately summarized the evidence presented at trial including over eighty exhibits and the testimony of fourteen witnesses. The evidence the trial court relied upon constituted clear and convincing evidence that (1) both sellers made false representations intended to induce the buyers to offer to purchase the property and enter into a contract to purchase, (2) the buyers reasonably believed the sellers' representations as to the property condition were true, and (3) the buyers relied on the false representations and suffered damages.

[¶ 34] Before leaving this issue, we briefly address the wording of the trial court's findings that the sellers "were aware or reasonably should have been aware" of the defects and damage to the west wall and heat registers, the serious east wall bulge, and the basement floor. At first glance, the language appears to apply an incorrect standard as the sellers had to have intended to defraud the buyers; therefore, they had to know of the defects they failed to disclose or misrepresented. In light of the record as a whole, we believe the language "were aware or reasonably should have been aware" was responsive to the sellers' implausible explanations. We conclude the trial court was endeavoring in a diplomatic manner to address the untruthful nature of the sellers' testimony. The trial court unquestionably determined there was clear and convincing evidence of fraud because the sellers knew of the defects and purposely made misrepresentations regarding the property condition to induce the buyers, to their significant detriment, to make a purchase offer and enter into a purchase contract. These findings are supported by clear and convincing evidence and are sufficient.

### D. Compensatory Damages

[¶ 35] The sellers contend the trial court abused its discretion by awarding compensatory damages in excess of the amounts in evidence and by attempting through the award to restore the property to a superior condition than existed previously. Damages are findings of ultimate fact. A jury's determination of the amount of damages is inviolate absent an award either so excessive or inadequate as to shock the judicial conscience and raise an inference that passion, prejudice, or other improper cause had invaded the trial. *Cross v. Berg Lumber Company*, 7 P.3d 922, 928 (Wyo.2000). However, the standard of review after a bench trial is less deferential. Damages are reviewed as fact and are not reversed unless clearly erroneous. *Id.*

[¶ 36] Compensatory damages are awarded to reimburse an individual for losses suffered as a result of another's failure to perform some duty. *Hollon v. McComb*, 636 P.2d 513, 516 (Wyo.1981); *State Farm Mutual Automobile Insurance Company v. Shrader*, 882 P.2d 813, 833 (Wyo.1994).

They are designed to make the individual whole; that is, to place him in the condition he would have been in if the other party had adequately performed the duty owed. *Id.* Damages are not recoverable which result from the injured party's breach of duty to take reasonable steps to protect himself. *Id.; Thayer v. Smith,* 380 P.2d 852, 854 (Wyo.1963). Questions concerning whether an injured party has exercised reasonable care and diligence are for the trier of fact to decide. *Id.; Asbell Bros., Inc. v. Nash–Davis Machinery Company,* 382 P.2d 57, 59 (Wyo.1963).

[¶ 37] The trial court found the damage for "repair and restoration" due to the sellers' misrepresentations was in the amount of $100,840.94. The sellers argue the amount is excessive because it represents payment to enhance the condition of the home to a level that never before existed. However, the sellers represented to the buyers that the home had not experienced water damage except from the water softener and rain spout seepage which had been fully repaired. Yet the foundation was actually in imminent danger of failure. The compensation question is not whether the home was ever in such an improved state. Rather, it is, what was the condition of the home as fraudulently represented by the sellers and upon which the buyers relied? Simply put, the buyers believed they were purchasing a home with sound foundation. Further, the buyers were encouraged to believe they would have a good and productive garden, a mobile home office appropriate and adequate to support a business endeavor, and the ability to connect to Northwest Rural Water District for $3,500.

[¶ 38] The record contains significant evidence regarding the costs to correct the property defects and the measures the buyers took to mitigate the damages. The sellers offered no evidence of their own to contest the costs of the repairs. The only error requiring correction is the award of damages of $8,122 for the Northwest Rural Water District hookup. The sellers represented the cost would be $3,500, and the actual cost was $8,122. To be adequately compensated, the buyers are entitled to only the $4,622 difference between these sums. We must, therefore, reverse in part and remand to the district court for correction of the order consistent herewith. We cannot conclude any of the remaining findings are clearly erroneous and, therefore, affirm the balance of the compensatory damages with adjustment for the Northwest Rural Water District hookup.

### E. Punitive Damages

[¶ 39] The sellers maintain the trial court could not award punitive damages because the buyers were awarded compensatory damages under the contract. They also argue the court improperly determined the sellers' net worth and considered inappropriate factors in making the award.

[¶ 40] This court has recognized that punitive damages are an implement of public policy. *Shrader,* 882 P.2d at 836–37. Punitive damages are not intended to compensate the plaintiff; instead, punitive damages are awarded to punish the defendant and deter others from such conduct in the future. *Id.* at 837. Punitive damages cannot be awarded when compensatory damages are not recoverable. *Bear v. Volunteers of America, Wyoming, Inc.,* 964 P.2d 1245, 1255 (Wyo.1998); *Cates v. Barb,* 650 P.2d 1159, 1161 (Wyo.1982). Punitive damages are not favored and are to be allowed cautiously within narrow limits. *Sheridan Commercial Park, Inc. v. Briggs,* 848 P.2d 811, 817 (Wyo. 1993); *see Town of Jackson v. Shaw,* 569 P.2d 1246, 1251 (Wyo.1977). Such damages are to be awarded only for conduct involving some element of outrage similar to that usually found in a crime. *Id.*

[¶ 41] We must determine whether the trial court reasonably concluded as it did because there is no right to punitive damages. *Sheridan Commercial Park, Inc.,* 848 P.2d at 818; *Squaw Mountain Cattle Company v. Bowen,* 804 P.2d 1292, 1298 (Wyo.1991). Outrageous conduct, malice, and willful and wanton misconduct are sufficient bases to warrant punitive damages. *Sheridan Commercial Park, Inc.,* 848 P.2d at 818. Sometimes, it is a fine distinction between conduct justifying punitive damages

and less culpable conduct. *Id.; Mayflower Restaurant Company v. Griego,* 741 P.2d 1106, 1116 (Wyo.1987). However, the decision to award punitive damages is within the district court's discretion, and we will not reverse the decision on appeal without finding a clear abuse of that discretion. *Parker v. Artery,* 889 P.2d 520, 525 (Wyo.1995); *Cates v. Daniels,* 628 P.2d 862, 868 (Wyo. 1981).

[¶ 42] In *Farmers Insurance Exchange v. Shirley,* 958 P.2d 1040 (Wyo.1998), we adopted the punitive damages factors enunciated in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (the degree of reprehensibility, the disparity between the harm or potential harm suffered and the award of punitive damages, and the difference between punitive damages and the civil penalties authorized or imposed in comparable cases), and the seven factors adopted from the specially concurring opinion of Justice Houston in *Aetna Life Insurance Company v. Lavoie,* 505 So.2d 1050, 1062 (Ala.1987):

"(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

"(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

"(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

"(4) The financial position of the defendant would be relevant.

"(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

"(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

"(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award."

*Shirley,* 958 P.2d at 1044 (quoting *Green Oil Company v. Hornsby,* 539 So.2d 218, 223–24 (Ala.1989)). A separate punitive damages hearing was held, and the buyers presented witnesses on the "reprehensible" nature of the sellers' fraudulent conduct and their financial circumstances. The sellers presented no witnesses of their own at this proceeding.

[¶ 43] We have reviewed the punitive damages award and the record in light of the *BMW of North America, Inc.* factors and conclude there was no abuse of discretion. The $25,000 award was slightly less than one-fourth of the compensatory damages. The harm to the buyers was significant and included damage to their credit, their ability to mortgage the property, and their living conditions. The evidence supports a determination the sellers' conduct was willful, wanton, and reckless. On the basis of the record, the punitive damages award does not appear extreme or unconscionable.

[¶ 44] The sellers' deception and fraud were profitable to them because they recognized $208,000 on the sale of a property which required more than $100,000 in repairs to prevent its ultimate collapse. The evidence presented at the punitive damages hearing established the sellers' net worth in February 2000 by their own calculation was approximately $418,842.11. Mrs. Alexander, who was called as a witness for the buyers, testified concerning the sellers' investments and interests in several corporations, trusts, and various real property as well as their continued employment income.

[¶ 45] Although the attorney fees and costs issue shall be considered separately below, we note the *BMW of North America,*

*Inc.* factors include them as an appropriate aspect of punitive damages. The trial court also clearly acknowledged and considered a $10,000 fine could be imposed as criminal sanctions for behavior similar to the sellers' fraud. Through Mrs. Alexander's testimony at the punitive damages hearing, the court was advised there was a possibility her realtor's license might be under investigation due to her dealings with the buyers, and this could potentially impact her future financial condition. No documentation was presented to verify this claim. In light of this evidence, the punitive award does not appear unreasonable.

[¶ 46] The trial court's decision to award punitive damages was expressly based on the "yardstick enunciated by *Farmers Insurance Exchange v. Shirley*, 958 P.2d 1040 (Wyo. 1998)," and found that (1) the buyers suffered substantial other economic loss as a result of the sellers' conduct, (2) the sellers' conduct constituted a wanton disregard to duty and/or gross or outrageous conduct, (3) the criminal fine for similar violations could be $10,000, (4) the sellers' net worth was approximately $418,842.11, and (5) the buyers' attorney fees and costs were reasonable. Pursuant to our analysis of the *BMW of North America, Inc.* factors and the record in this case, we conclude the trial court did not abuse its discretion in awarding $25,000 in punitive damages.

### F. Attorney Fees and Costs

[¶ 47] The sellers also contend the trial court committed error in awarding the attorney fees. They argue attorney fees are damages to be awarded by application of clause XIII of the purchase contact, which allocates the burden of proof to the buyers, and the buyers failed to submit exhibits and testimony at trial to support such damages. The sellers further maintain that, despite the buyers' failure to prove the attorney fees, the trial court ordered them to pay an unspecified amount of attorney fees in the February 22, 2000, order. The very foundation of this argument—that the award was based on the contract provision—is erroneous. The buyers' causes of action were fraud and inten-

tional infliction of emotional distress. No contract action was pleaded.

[¶ 48] In an effort to support this contention, the sellers take out of context the following comment made by the trial court at the punitive damages hearing: "The Court, when it made a determination of attorney fees, did not do so under the inclination of punitive damages, it was under contract." Their brief fails to accurately reflect the entire circumstance of the in-court exchange. The buyers' attorney advised the trial court that *Shirley*, 958 P.2d 1040, through adoption of the *BMW of North America, Inc.* factors, expressly provided for attorney fees and costs as an aspect of punitive damages. He further advised the court, pursuant to that authority, an award of fees and costs incurred in the punitive damages phase of the litigation could be made. Thereafter, the trial court responded: "All right. Mr. Darrah, I will give you 15 days to amend your attorney fees and costs in this matter." In the subsequent order on punitive damages, the court explicitly stated:

> [A]fter having reviewed the evidence on punitive damages, the objections to [the buyers'] attorney fees and costs, the evidence and supplemental evidence submitted by the [buyers'] attorneys pertaining to costs and attorney fees, and using the yardstick enunciated by *Farmers Insurance Exchange v. Shirley*, 958 P.2d 1040 (Wyo.1998), the court finds as follows:
>
> . . .
>
> 5. That [the buyers'] attorney fees and costs are reasonable.

Though the trial court initially stated it was awarding the buyers attorney fees and costs on the basis of the contract, we conclude the final written order clearly established the ultimate foundation of the award was the *BMW of North America, Inc.* punitive damages factors.

[¶ 49] Wyoming subscribes to the American rule regarding recovery of attorney fees. *Schlesinger*, 2001 WY 120, ¶ 21, 35 P.3d 1232; *Cline v. Rocky Mountain, Inc.*, 998 P.2d 946, 949 (Wyo.2000). Under the American rule, each party is generally responsible for his own attorney fees. *Id.* However, a prevailing party may be reim-

bursed for his attorney fees when express statutory or contractual authorization exists for such an award. *Id.* Moreover, an exception may be applied in the circumstances of fraud and the corollary award of punitive damages. *See Olds v. Hosford,* 354 P.2d 947, 950 (Wyo.1960) (recognizing an exception to the general rule denying recovery of attorney fees and costs in a replevin action where "fraud, malice, oppression or wil[l]ful wrong" can be shown). We conclude the trial court applied the punitive damages exception to award all attorney fees and costs attendant to the entire course of the litigation.

To determine the reasonableness of the attorney's fees award, Wyoming employs the two-factor federal lodestar test. These factors are: "(1) whether the fee charged represents the product of reasonable hours times a reasonable rate; and (2) whether other factors of discretionary application should be considered to adjust the fee either upward or downward." It follows therefrom that the trial court's determination concerning attorney's fees is reviewed under an abuse of discretion standard.

*Schlesinger,* 2001 WY 120, ¶ 21, 35 P.3d 1232 (quoting *Johnston v. Stephenson,* 938 P.2d 861, 862–63 (Wyo.1997)) (some citations omitted). Similar to the facts of the *Schlesinger* case, the buyers and their counsel provided detailed time records and attorneys' affidavits to support the reasonableness of the fees and costs claimed. At the punitive damages hearing, the trial court provided the parties the opportunity to fully litigate the reasonableness of the fees and costs requested. Numerous pleadings and supplemental filings were accepted and considered by the trial court. The record leaves no doubt that the trial court carefully considered the lodestar factors through its review of the evidence supporting the request for attorney fees and costs as well as the sellers' objections. We find no abuse of discretion in the trial court's award of attorney fees and costs.

[¶ 50] Affirmed in part, reversed in part, and remanded for correction of the judgment consistent with this opinion.