2010 WY 53

Scott **KERBS,** an individual and as a partner in the Kerbs Four Bar Ranch Partnership, Kip Kerbs, an individual and as a partner in the Kerbs Four Bar Ranch Partnership, Carl Kerbs and Nadene Kerbs, individually, as husband and wife, and as partners in the Kerbs Four Bar Ranch Partnership, and Kerbs Four Bar Ranch, a Wyoming Partnership, Appellants (Defendants),

v.

Eugene W. **WALCK,** Jr., Appellee (Plaintiff).

No. S–09–0121.

Supreme Court of Wyoming.

April 27, 2010.

Representing Appellants: Daniel B. Frank, Frank Law Office, PC, Cheyenne, Wyoming.

Representing Appellee: William M. MacPherson and Brandon W. Snyder, MacPherson, Kelly & Thompson, LLC, Rawlins, Wyoming. Argument by Mr. Snyder.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   After a bench trial, the district court entered judgment in favor of Eugene W. Walck, Jr., ruling that the Kerbs Ranch[1] had

1.  In this opinion, "the Kerbs Ranch" refers collectively to all of the Appellants, and "Mr. Kerbs"

wrongfully interfered with Mr. Walck's water rights. The Kerbs Ranch appeals. We will affirm.

## ISSUES

[¶ 2] The Kerbs Ranch presents these three issues:

1. Did the trial court err in awarding damages to Mr. Walck for lost crop production that was not caused by Kerbs Ranch?

2. Did the trial court err in awarding damages to Mr. Walck for lost crop production for Kerbs Ranch asserting its rightful share of water in commonly-owned ditches when the parties' water rights were of equal priority?

3. Did the trial court err in calculating the amount of damages based on the Farm Service Agency's county-wide average when evidence was presented showing that Mr. Walck's historical hay and pasture crop production was only 68.5 percent of the county-wide average?

Mr. Walck contends that the district court's conclusions of law were correct, and that its findings of fact, including its damages calculations, were not clearly erroneous.

## FACTS

[¶ 3] The Kerbs Ranch is located in Carbon County, Wyoming, a few miles west of the town of Saratoga. Mr. Walck's ranch is immediately west of the Kerbs Ranch. Jack Creek, a tributary of the North Platte River, winds its way in a northeasterly direction through Mr. Walck's ranch, then through the Kerbs Ranch. Both ranches use irrigation water from Jack Creek to produce hay that is used as winter feed for cattle.

[¶ 4] In the spring of 2002, due to drought conditions and low water levels, the State of Wyoming regulated the North Platte River in response to the Federal Bureau of Reclamation's call to fulfill its water rights for Pathfinder Reservoir. This was commonly referred to as the "Pathfinder Call." Pathfinder's water rights date back to 1904, so when the North Platte came under regula-

refers to Scott Kerbs.

tion, pre–1904 water rights could still be fulfilled, while post–1904 water rights generally could not. As a tributary to the North Platte, Jack Creek was subject to the Pathfinder Call. Both Mr. Walck and the Kerbs Ranch have some pre–1904 water rights, which were fulfilled, and some post–1904 water rights, which were not.

[¶ 5] With less rainfall and less irrigation water than usual, Mr. Kerbs took actions to get the water he felt he was entitled to receive. In his words, "I ... did what I had to do." Additional details about the actions taken by Mr. Kerbs will be set forth in the discussion section. For now it is sufficient to note two details. First, based on his actions, Mr. Kerbs was convicted of unlawful water use and tampering with a headgate, a misdemeanor pursuant to Wyo. Stat. Ann. § 41–3–614 (LexisNexis 2001). Second, Mr. Walck claims that Mr. Kerbs's actions wrongfully deprived him of the irrigation water he was entitled to receive. That is the root of the litigation before us now.

[¶ 6] Mr. Walck filed suit in 2004, pleading eighteen causes of action against the Kerbs Ranch. The Kerbs Ranch filed an answer, along with six counterclaims against Mr. Walck. Many of these claims and counterclaims were resolved through mediation, and the rest went to trial. Following a bench trial, the district court issued a thorough and detailed Judgment and Order, ruling in favor of Mr. Walck on some claims and in favor of the Kerbs Ranch on others. The Kerbs Ranch's appeal is limited to the district court's rulings on claims that it wrongfully interfered with Mr. Walck's water rights.

## STANDARD OF REVIEW

[¶ 7] We apply a well-established standard of review to a district court's judgment after a bench trial:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible

evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence. Findings of fact will not be set aside unless the findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. We review a district court's conclusions of law *de novo* on appeal.

*Springer v. Blue Cross & Blue Shield*, 944 P.2d 1173, 1175–76 (Wyo.1997) (internal citations omitted). We assume that the evidence of the prevailing party is true, and give that party every favorable inference that can fairly and reasonably be drawn from that evidence. *Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004).

### DISCUSSION

[¶ 8] A preliminary issue raised by the Kerbs Ranch is that the district court failed to specify whether Mr. Walck's claims "sounded in negligence or an intentional tort such as conversion." This Court has considered several cases involving wrongful interference with water rights over the years, but never found it necessary to fit such claims into any specific tort category. *See, e.g., Stoner v. Mau*, 11 Wyo. 366, 72 P. 193 (1903); *Gustin v. Harting*, 20 Wyo. 1, 121 P. 522 (1912); *Wallis v. Luman*, 625 P.2d 759 (Wyo. 1981). In *Van Buskirk v. Red Buttes Land and Live Stock Co.*, 24 Wyo. 183, 199, 156 P. 1122, 1126 (1916), we observed that "there can be no doubt that at common law, and under the code prescribing civil remedies, there would be a right of action for damages for a wrongful interference with a water right to the injury of the owner thereof." Consistent with that basic formulation, the district court ruled that the Kerbs Ranch wrongfully interfered with Mr. Walck's water rights, to his injury. The record in this case

leaves no doubt that the district court, and the Kerbs Ranch, fully understood the nature of Mr. Walck's claims.

[¶ 9] With the general contention out of the way, we turn to the details of Mr. Walck's claims against the Kerbs Ranch. We will start with claims relating to irrigation ditches on the north side of Jack Creek, then consider claims relating mostly to irrigation ditches on the south side of Jack Creek. Finally, we will review the district court's damages calculations.

### North of Jack Creek

■ [¶ 10] On the north side of Jack Creek there are two irrigation ditches at issue in this appeal. The headgate of the Forney No. 2 Ditch is upstream on Jack Creek, and the headgate of the D. McPhail Ditch is downstream. The two ditches run nearly parallel, and very close together, for approximately five miles across Mr. Walck's ranch. Then, near the border with the Kerbs Ranch, the Forney No. 2 Ditch goes through a flume and crosses over the D. McPhail Ditch. After that, the D. McPhail Ditch remains on Mr. Walck's ranch, while the Forney No. 2 Ditch crosses onto the Kerbs Ranch, running at a slightly lower elevation than the other ditch.

[¶ 11] Water in the D. McPhail Ditch is split between Mr. Walck and the Kerbs Ranch.[2] The Forney No. 2 Ditch supplies irrigation water only to the Kerbs Ranch. However, the Kerbs Ranch was not actually using the D. McPhail Ditch, and had not done so for over fifty years. Instead, it sent its water from both the D. McPhail Ditch and the Forney No. 2 Ditch through Forney No. 2, which is apparently larger and easier to maintain. Despite this long-standing practice, the Kerbs Ranch had never applied for permission to change its point of diversion or means of conveyance from the D. McPhail Ditch to the Forney No. 2 Ditch, as required by Wyo. Stat. Ann. § 41–3–114.[3] The Kerbs

2. Third parties also own water rights in the irrigation ditches discussed in this case, but those rights are not at issue in this litigation, and we will refer to the allocations only as between Mr. Walck and the Kerbs Ranch.

3. Wyo. Stat. Ann. § 41–3–114 provides, in pertinent part, that:
(a) Any person entitled to the beneficial use of water ... who desires to change the point of diversion or means of conveyance, or both, shall file a petition with:

Ranch received permission in 1994 for a temporary diversion from the D. McPhail Ditch to the Forney No. 2 Ditch, but that permission was effective only during the 1994 irrigation season.

[¶ 12]   As noted above, in 2002 Jack Creek was subject to the Pathfinder Call on the North Platte River.   On or around April 12, 2002, the water commissioner placed notices on the headgates of the Forney No. 2 and D. McPhail Ditches, informing those with water rights in the ditches that, until May 1, they could take water through the ditches only to the extent of their pre–1904 water rights. Mr. Kerbs saw the notices, but did not adjust the headgates so that the D. McPhail and Forney No. 2 Ditches each took the allocated amount of water.   Instead, as he explained it, "I took our D. McPhail water that we're entitled to in the Forney· [No. 2] as I'd customarily done."

[¶ 13]   On April 25, Mr. Kerbs noticed that the water in the Forney No. 2 Ditch "was way down."   Following the ditch upstream, he found that the headgates of the Forney No. 2 and D. McPhail Ditches had been adjusted by the water commissioner, with locks and chains put in place so that they could not be readjusted.   He confronted the commissioner, who told Mr. Kerbs that he was not entitled to take his D. McPhail water through the Forney No. 2 Ditch, and the headgates had been locked and chained to stop him from doing that.   According to Mr. Kerbs, the headgates were chained and locked in a position that did not allow the Kerbs Ranch to take its full allocation of water, but the water commissioner was not responsive to his complaints.

[¶ 14]   Whether in the correct amount or not, water was flowing in the D. McPhail Ditch during May of 2002.   But as Mr. Kerbs explained:

I had no way of getting it out of the D. McPhail [Ditch], so I went into the ranch supply store and bought a culvert and a slide gate and went up and installed the culvert and slide gate in the ditch to take water out of the D. McPhail and drop it

(i) The board of control if the use of the water has been adjudicated under a certificate of appropriation;

into Forney [No. 2] so we could get our water.

Mr. Kerbs also placed a canvas dam in the D. McPhail Ditch to help divert its water into the Forney No. 2 Ditch.

[¶ 15]   Mr. Kerbs installed the culvert and dam at or near the spot where the Forney No. 2 Ditch crosses over the D. McPhail Ditch.   As noted before, from that point the D. McPhail Ditch remains on Mr. Walck's ranch on higher ground, while the Forney No. 2 crosses into the Kerbs Ranch on lower ground.   Mr. Walck owns 23 acres of land below the D. McPhail Ditch and above the Forney No. 2 Ditch.   By taking water out of the D. McPhail Ditch and placing it into the Forney No. 2 Ditch, Mr. Kerbs effectively prevented Mr. Walck from irrigating those 23 acres.

[¶ 16]   Mr. Walck claimed that Mr. Kerbs took all of the water out of the D. McPhail Ditch.   He testified unequivocally that "no water was allowed to pass beyond that dam to irrigate lands that I have down ditch from that point."   In response to the question of how that damaged him, Mr. Walck explained succinctly, "no water, no crop."   Mr. Kerbs testified that he did not take all of the water out of the D. McPhail Ditch:

There was always some water going past there.   [Mr. Walck's] 23 acres below would be entitled to three-tenths of a foot of water, and I never shut it off exactly tight. I don't—I don't know exactly how much water was going behind there, because I had no way of measuring it.   But there was some water going—trickling past.   I used the amount of water that we're entitled to at that pipe by the measuring flume that was upstream.   It's 85 or 90 feet as I recall.

[¶ 17]   The district court apparently found Mr. Walck's testimony more persuasive, and made this finding of fact:

18.   The dam and outlet pipe in the D. McPhail Ditch harmed Plaintiff.   After the dam was placed in the ditch in 2002, Plaintiff's 23–acre field below the dam and out-

(ii) The state engineer in all other cases.

let pipe received very little or no water. In 2002, the 23–acre field produced no hay crop due to this dam.

The Kerbs Ranch disputes this finding of fact. Applying the appropriate standard of review, we will affirm it unless, after reviewing all of the evidence, we conclude it is clearly erroneous.

[¶ 18] The record suggests several reasons that the district court might find the testimony of Mr. Walck more credible than that of Mr. Kerbs. Mr. Walck stated plainly that the dam allowed no water to pass. Mr. Kerbs testified that the trickle of water going past the dam supplied all of the water Mr. Walck was entitled to receive. However, Mr. Kerbs admitted that he did not really know how much water was trickling past the dam, and he had no way to measure it. Because he did not know the amount, it was reasonable for the district court to discount Mr. Kerbs's testimony that Mr. Walck was getting his full amount. This finding of fact is not clearly erroneous.

[¶ 19] The district court also found that the dam and culvert remained in place, and continued to divert the water from the D. McPhail Ditch to the Forney No. 2 Ditch, throughout the 2002 and 2003 irrigating seasons. In slightly altered form, it also remained there during the 2004 irrigating season. These findings are also supported by evidence in the record.

[¶ 20] Based on those findings, the district court concluded that the "Defendants violated Wyoming law when they installed an outlet pipe and dam in the D. McPhail Ditch in order to change the means of conveyance of their D. McPhail water." That conclusion is fully consistent with Wyoming law. The Kerbs Ranch's diversion of water from the D. McPhail Ditch to the Forney No. 2 Ditch violated Wyo. Stat. Ann. § 41–3–114, which prohibits the water rights owner from changing the point of diversion or means of conveyance without permission from the State. Even before this statutory provision existed, Wyoming law prohibited changes in the point of diversion or means of conveyance "when the change will injure others." *Groo v. Sights*, 22 Wyo. 19, 30, 134 P. 269, 272 (1913).

[¶ 21] The Kerbs Ranch's primary claim relating to these findings and conclusions is that the district court's decision elevates Mr. Walck's water rights over the Kerbs Ranch's water rights, even though their rights are of equal priority. The Kerbs Ranch bases this claim on the district court's Finding of Fact 17, which it characterizes as follows: "The trial court recognized that Plaintiff received his allocation for his 23–acre field, but it was not enough."

[¶ 22] This is a mischaracterization of the district court's decision. Finding of Fact 17, in its entirety, reads as follows:

17. Defendants contend that they have made an effort to ensure that the Plaintiff receives his portion of the D. McPhail water below their outlet pipe and dam. However, allowing merely .33 cfs (Plaintiff's technical portion of the D. McPhail water) to proceed down the ditch to be applied to Plaintiff's 23 acres is not efficient use of water nor is it enough to fulfill his right upon reaching the point of use.

On first reading, this might be read to suggest that the Kerbs Ranch was required to send Mr. Walck even more water than he was technically entitled to receive. That changes when the finding is placed in context.

[¶ 23] The Kerbs Ranch contended that an effort was made to provide Mr. Walck his water. However, in Finding of Fact 18, the district court stated plainly that Mr. Walck "received very little or no water." Apparently the district court believed that the Kerbs Ranch's effort to provide water was not successful. The key finding is that Mr. Walck did not get the water he was entitled to receive.

[¶ 24] Finding of Fact 17 must also be read in light of the fact that the Kerbs Ranch was not entitled to divert any water from the D. McPhail Ditch to the Forney No. 2 Ditch. In other words, the Kerbs Ranch was legally required to leave the entire flow of the D. McPhail Ditch in the D. McPhail Ditch. It violated that requirement, regardless of how little or how much water was left to trickle down to Mr. Walck. In this context, the district court's finding does not indicate that Mr. Walck was entitled to more than 0 .33

c.f.s., but rather, that the Kerbs Ranch was not entitled to divert any of the water from the D. McPhail Ditch into the Forney No. 2 Ditch. Contrary to the Kerbs Ranch's claim, the district court did not elevate Mr. Walck's water rights over those of the Kerbs Ranch.

[¶ 25] We are satisfied that none of the district court's findings of fact with regard to the north side of Jack Creek are clearly erroneous. We are equally satisfied that its conclusions of law are sound.

### South of Jack Creek

■ [¶ 26] As noted above, on April 26, 2002, the water commissioner adjusted the headgates of the Forney No. 2 Ditch and the D. McPhail Ditch and placed chains and locks on them to prevent tampering. The commissioner also adjusted, chained, and locked the headgate of the Forney Ditch Company Ditch, which is on the south side of Jack Creek with a headgate downstream from the Forney No. 2 Ditch and upstream of the D. McPhail Ditch. Notices were attached to all three headgates indicating that they were under regulation until May 1, 2002.

[¶ 27] On the morning of May 1, Mr. Kerbs noticed that the three headgates were still chained and locked, despite the fact that the regulation had expired. As he testified,

> I went back that evening with the bolt cutters. And the locks and chains were still on those headgates with expired notices, and I knew legally they were not supposed to be there. So I cut an end link of chain off of each chain, laid the lock and chain by the headgate, and opened up the headgates and started irrigating as I would in a normal year.

[¶ 28] Also on May 1, Mr. Walck met with the water commissioner to express concern that he was not receiving the water he was entitled to receive through several of his irrigation ditches. In response, the water commissioner placed a new call for regulation on Jack Creek, to begin on the afternoon of May 1. It is undisputed that Mr. Kerbs had not received notice of the new call for regulation on Jack Creek on May 1, when he cut the chains on the headgates.[4] Mr. Kerbs testified that he first learned of the new call on May 8 or 9.

[¶ 29] On May 7, the water commissioner returned to the headgates on the Forney No. 2, D. McPhail, and Forney Ditch Company Ditches, and discovered that the chains had been cut and the headgates adjusted to take more water. Based on the new call on Jack Creek, the commissioner readjusted the headgates, and again chained and locked them. On May 14, the commissioner and Mr. Walck found that the chains had again been cut, and the headgates readjusted. This time, however, the headgates of the Forney Ditch Company Ditch and the D. McPhail Ditch had been shut off, letting no water into the two ditches shared by Mr. Walck and the Kerbs Ranch, but allowing more water to flow downstream to another irrigation ditch that served only the Kerbs Ranch. The commissioner did not reopen these headgates again until May 21. His reason for waiting a week is not clear from the record, but Mr. Walck testified that the water commissioner contacted the sheriff, suggesting that the headgates may have been left closed to accommodate a criminal investigation.

[¶ 30] With regard to Mr. Kerbs's shutting the headgates, the district court made this finding of fact:

> 27. Had the Defendants not shut off the headgates, Plaintiff would have continued to receive his appropriation through the D. McPhail Ditch and the Forney Ditch Company Ditch from May 14, 2002 through May 21, 2002.

---

4. It is apparently because of Mr. Kerbs's lack of notice that Mr. Walck did not claim any damages relating to Mr. Kerbs's cutting the chains and adjusting the headgates on May 1. In addition, we note that while Mr. Kerbs was convicted in the circuit court for unlawful use of water and tampering with the headgates on May 1, the district court reversed the conviction on appeal specifically because, on May 1 when he cut the chains, Mr. Kerbs knew that the Pathfinder Call had expired, and had not received any notice of the new call for regulation. In contrast, Mr. Kerbs had received notice of the Pathfinder Call on April 26 when he adjusted the headgates to take more water than he was entitled to receive, and his conviction for unlawful use of water and tampering with headgates on April 26 was affirmed.

This finding led to the district court's conclusion that the Kerbs Ranch unlawfully tampered with the headgates of the D. McPhail and Forney Ditch Company Ditches, thereby wrongfully depriving Mr. Walck of water to which he was legally entitled, and causing him injury.

[¶ 31] The Kerbs Ranch claims that the district court "improperly blamed Kerbs Ranch for the Water Commissioner's arbitrary act of shutting off the water to the parties' ditches from May 14 to May 21, 2002." However, the record provides no support for the insinuation that the water commissioner shut the headgates. There is evidence that Mr. Kerbs shut the headgates, including his admission that he had previously cut the chains and adjusted the headgates, and the fact that shutting the headgates to those ditches left more water for Mr. Kerbs to use in a lower ditch. Based on this evidence, the district court found that, "Although no one saw Defendant Scott Kerbs cut the chains the second time, it appears more likely than not that he did indeed do so."

[¶ 32] The Kerbs Ranch also suggests that, even if it was Mr. Kerbs who shut off the headgates, the water commissioner should have reopened them to give Mr. Walck his water. However, the Kerbs Ranch has presented no authority supporting the assertion that the water commissioner had that duty, either at common law or under the applicable statutes. Further, it has not explained how, in the circumstances of this case, the commissioner's action or inaction would relieve it of responsibility for Mr. Kerbs's tortious conduct. We therefore reject this effort to shift the blame to the water commissioner.

■ [¶ 33] Next, the Kerbs Ranch seems to contend that Mr. Walck was at fault because he could have opened the headgates himself. It is true that a "plaintiff cannot recover for any losses which might have been prevented by reasonable efforts on his part." *Bader v. Mills & Baker Co.*, 28 Wyo. 191, 198–99, 201 P. 1012, 1014 (1921) (regarding a plaintiff's duty to repair his irrigation ditches after they were damaged by the defendant). However, "[o]nly reasonable efforts and expenditures are required under this rule. The test is, what would an ordinarily prudent man do under like circumstances?" *Id.* at 199, 201 P. at 1015. When cross-examined at trial, Mr. Walck provided this explanation of why he did not open the headgates:

[Jack] Creek was under regulation, and I thought that there'd been crimes committed. I didn't go any closer to the crime scene after that, and I figured that the water commissioner would be coming back to adjust when it was appropriate.... It was—it appeared to be a crime had been committed since the state locks—the headgates had been chained, and since the [commissioner] told me he was calling the sheriff and asked me to call his boss, I thought that the matter was out of my hands.

Given his awareness that opening the headgates could be considered a criminal act, it would not have been reasonable or prudent for Mr. Walck to open them. We also reject this attempt to shift the blame to Mr. Walck.

[¶ 34] Finally, the Kerbs Ranch asserts that it cannot be held liable for shutting off the water in these two ditches, because shutting off the water provided no benefit to the Kerbs Ranch. Based on *Van Buskirk*, 24 Wyo. 183, 156 P. 1122, and the other wrongful interference with water rights cases discussed earlier, it is not clear that benefit to the defendant is a necessary element of such a claim. We do not need to resolve that, however, because the record indicates that the Kerbs Ranch did benefit. As Mr. Walck testified, when Mr. Kerbs shut the headgates to the D. McPhail and Forney Ditch Company Ditches—the ditches shared by Mr. Walck and the Kerbs Ranch—more water was allowed to flow down Jack Creek and into a lower irrigation ditch that provides water only to the Kerbs Ranch, not to Mr. Walck.

[¶ 35] Also with regard to the Forney Ditch Company Ditch, the district court found that:

29. On June 6, 2002, Plaintiff found that Defendants had shut off two outlet pipes to his lower creek field. Plaintiff further discovered that at that time Defendants were receiving ample water for irrigation and

Plaintiff was only receiving a minimal amount.

The Kerbs Ranch claims that it was "merely attempting to bring water to the end of the ditch to receive their rightful appropriation." It argues that, "Under the trial court's findings and conclusions, Kerbs Ranch, being at the end of the ditch must wait until Plaintiff, at the upper end of the ditch, fulfills his water rights." Because its water rights are of equal priority with Mr. Walck's, the Kerbs Ranch again argues that the district court "elevated Plaintiff's right over the Kerbs Ranch's right."

[¶ 36] The district court did not decide that the Kerbs Ranch had to let Mr. Walck take his full allotment of water before it got any. It found that the Kerbs Ranch was getting "ample water" while Mr. Walck was getting "a minimal amount." This was unlawful precisely because Mr. Walck's water rights are of equal priority to those of the Kerbs Ranch. If there was a shortage of water, the parties must share the shortfall equally. Because their water rights are of equal priority, Mr. Kerbs was not entitled to take "ample water" while leaving Mr. Walck only "a minimal amount."

[¶ 37] Having reviewed all of the evidence, we are convinced that the district court's findings of fact with regard to the ditches on the south side of Jack Creek are not clearly erroneous. Its conclusions of law are sound, and will be affirmed.

### Damages

[¶ 38] The district court awarded Mr. Walck $13,917.95 as total damages for his reduced crop production during the years 2002, 2003, and 2004. In calculating the damages for 2002, the district court relied on evidence provided by Mr. Walck that, according to the United States Department of Agriculture, historical average production in Carbon County is 1.4 tons of hay per acre. The Kerbs Ranch's only objection to the damages calculations is that the district court used the county-wide average, while Mr. Walck had testified that actual production on his ranch was consistently below the county-wide average. In its brief, the Kerbs Ranch insists that "the trial court's entire calculation of

damages was tainted by the use of the county-wide hay production average in the face of Plaintiff's own production records showing a decidedly lower hay productivity."

[¶ 39] This argument is factually inaccurate because the district court did not use the county-wide average hay production figure of 1.4 tons per acre in its "entire calculation of damages," as suggested by the Kerbs Ranch. Part of Mr. Walck's damages related to reduced pasturage, not reduced hay production, and the district court did not use the county-wide average hay production figure to calculate those damages. Also, the district court used the county-wide average only to calculate the damages during 2002. For 2003 and 2004, it used Mr. Walck's actual production figures. For example, Finding of Fact 19 sets forth this calculation:

> 19. In 2003, this [23 acre] field again produced no crop because Defendants left this dam in place [in the D. McPhail Ditch], despite the requests by Plaintiff to remove the dam. Plaintiff's Exhibits 9 and 10. **Plaintiff's production in other irrigated fields in 2003 was 1.135 ton per acre.** Therefore, the lost production amounted to $1,957.88 (23 acres × **1.135 tons per acre** = 26.105 [tons] × $75.00 per ton = $1,957.88).

(Emphasis added.)

[¶ 40] Even when the district court used the county-wide average hay production figure of 1.4 tons per acre to calculate 2002 damages, it also recognized that 2002 production was substantially below the historical average. The information from the United States Department of Agriculture indicating county-wide average hay production of 1.4 tons per acre also established that, due to drought conditions in 2002, county-wide average production was only 15% of the historical average. Accordingly, in Finding of Fact 18, the district court presented this calculation:

> 18. The dam and outlet pipe in the D. McPhail Ditch harmed Plaintiff. After the dam was placed in the ditch in 2002, Plaintiff's 23–acre field below the dam and outlet pipe received very little or no water. In 2002, the 23–acre field produced no hay crop due to this dam. The Plaintiff was

damaged in the amount of $362.25 (23 acres × 1.4 ton per acre × *15% county average of normal production* = 4.82 tons × $75.00 per ton).

(Emphasis added.)

[¶ 41] By reducing the county-wide average to account for the drought, the district court, in effect, calculated Mr. Walck's lost production to be 0.21 tons per acre (1.4 tons per acre × 15% county average of normal production = 0.21 tons per acre). Mr. Walck testified that his actual production in 2002 was approximately .27 tons per acre, higher than the county-wide average. If we adjusted the district court's calculations by using actual production figures instead of county-wide averages, as the Kerbs Ranch advocates, Mr. Walck's total damages would actually be increased.

 [¶ 42] This adjustment is unnecessary. Mr. Walck did not appeal the district court's damages calculations. Moreover, the amount of damages "is within the sound discretion of the jury or trial judge who tries the case, and we will not disturb the award unless it is shown to be so excessive or unreasonable as to indicate passion or prejudice on the part of the trial court." *Fitzsimonds v. Cogswell*, 405 P.2d 785, 787 (Wyo. 1965). The damages calculated by the district court are not excessive or unreasonable, and contain no hint of passion or prejudice. We are more inclined to agree with the district court's finding that the damages sought by Mr. Walck were "conservative and reasonable." "Damages are reviewed as fact and are not reversed unless clearly erroneous." *Alexander v. Meduna*, 2002 WY 83, ¶ 35, 47 P.3d 206, 217 (Wyo.2002). The Kerbs Ranch has failed to show that the district court's damages calculations are clearly erroneous.

[¶ 43] Affirmed.